[Civ. No. 53161. First Dist., Div. Five. Apr. 20, 1984.]

In re the Marriage of MARIA A. and PAUL M. HUG.
MARIA A. HUG, Respondent, v.
PAUL M. HUG, Appellant.

**COUNSEL**

William Scott and Peter J. Giamalis for Appellant.

J. Norman Baker for Respondent.

**OPINION**

**KING, J.**—■ In this case we hold that in marital dissolution actions the trial court has broad discretion to select an equitable method of allocating community and separate property interests in stock options granted prior to the date of separation of the parties, which became exercisable after the date of separation. ■ It was not an abuse of discretion, under the facts of this case, for the trial court to allocate those interests by applying a time rule, finding that the number of options determined to be community property is a product of a fraction in which the numerator is the period in months between the commencement of the spouse's employment by the employer and the date of separation of the parties, and the denominator is the period in months between commencement of employment and the date when each option is first exercisable, multiplied by the number of shares which can be purchased on the date the option is first exercisable. The remaining op-

tions are the separate property of the employee. In so holding, we stress that trial courts, in the exercise of their discretion, are not limited to this formula in seeking to achieve an equitable allocation of separate and community interests in employee stock options.

Pursuant to interlocutory and final judgments of dissolution, the marriage of Maria and Paul Hug was dissolved resolving all issues, including a determination that 1,265 shares of Amdahl Corporation stock acquired pursuant to stock options exercised during the marriage were community property, subject only to a later determination of the separate or community character of options to purchase an additional 1,835 shares of stock in Amdahl Corporation, Paul's employer. Upon a further hearing, the trial court found that options to purchase 1299.37 shares of Amdahl Corporation stock were community property and entered a judgment dividing them equally between the parties, awarding the remaining options to purchase 535.63 shares of Amdahl Corporation stock to Paul as his separate property. Paul appeals the allocation of the options to purchase the 1,835 shares of Amdahl stock, contending the formula utilized by the trial court was erroneous. We affirm the judgment.

Maria and Paul were married on April 31, 1956, and separated on June 9, 1976. On November 6, 1972, Paul left a position with International Business Machines, Inc. (IBM) to begin employment at Amdahl. While employed at Amdahl, he was granted options to purchase 3,100 shares of Amdahl's stock. The trial court found that the stock option plan was adopted "for the purpose of attracting and retaining the services of selected directors, executives and other key employees and for the purpose of providing an incentive to encourage and stimulate increased efforts by them."

Amdahl granted the first of the disputed options on August 9, 1974, an option to purchase 1,000 shares at $1 per share. The trial court found that this option "replaced" an earlier option to purchase 1,000 shares at $20 per share which had been awarded on November 22, 1972, just two weeks after Paul commenced employment at Amdahl. Paul and Amdahl mutually rescinded the 1972 agreement in August of 1974. Amdahl also granted the second option on August 9, 1974, for 1,300 shares at $1 per share. Amdahl granted a third option for 800 shares on September 15, 1975, at $5 per share. Each of the options was exercisable over four years each in yearly increments of 30 percent, 25 percent, 25 percent, and 20 percent.

Since portions of the options were exercisable only after the parties' separation, the court sought to allocate the options to reflect the relationship between periods of Paul's community contribution in comparison to his overall contribution to earning the option rights. In other words, the trial

court attempted to fairly allocate the stock options between compensation for services prior to and after the date of separation.[1]

Thus, the court found that "[t]he community property portion of the unexercised shares is the product of a fraction whose numerator is the length of service expressed in months by respondent [Paul] with Amdahl from the date of commencement of service to the date of separation of the parties and the denominator is the length of service expressed in months from the date of commencement of service to the date when an option could be first exercised, multiplied by the number of shares that could be purchased on the date of exercise." Application of this formula to the disputed 1,835 shares of Amdahl stock yielded the division noted above.

Paul agrees that an apportionment should be accomplished according to a time rule, but contends the trial court utilized an erroneous formula.[2] Paul contends that the proper time rule should begin as of the date of granting the option, not the date of commencement of employment, since the options were not granted an incentive to become employed by Amdahl. In addition, he argues that each annual option is a separate and distinct option which is compensation for services during that year, thus it accrues after the date of separation and should be totally his separate property.

Our research leads us to conclude that the issue before us, that of determining community and separate property interests in employee stock options granted to the employee's spouse prior to the date of separation, but only exercisable thereafter, is an issue of first impression.

Treatises which describe employee stock options in the context of general corporations law strongly suggest that contractual rights to such benefits vary so widely as to preclude the accuracy of any but the most general characterization of them. Thus, there is no compelling reason to require that employee stock options must always be classified as compensation exclusively for past, present, or future services. Rather, since the purposes underlying stock options differ, reference to the facts of each particular case must be made to reveal the features and implications of a particular employee stock option.

---

[1]Postseparation earnings of a spouse are the separate property of that spouse. (Civ. Code, § 5118.)

[2]The term "time rule" has heretofore been primarily utilized to describe a formula for determining the community interest in retirement benefits according to the ratio of the length of employment between the date of marriage (or date of commencement of employment, if later) and the date of separation to the total length of employment. (*In re Marriage of Judd* (1977) 68 Cal.App.3d 515 [137 Cal.Rptr. 318]; *In re Marriage of Adams* (1976) 64 Cal.App.3d 181 [134 Cal.Rptr. 298].)

At the most general level, employment benefits such as stock options may be classified as an alternative to fixed salaries to secure optimal tax treatment.[3] (5 Fletcher, Cyclopedia Corporations (rev.ed 1976) § 2136, p. 514.) In this sense, stock options fall into the same category as, for example, fringe benefits, health and welfare benefits, incentive compensation based on company profits, deferred compensation plans, and pension and profit-sharing arrangements. (1 Washington & Rothschild, Compensating the Corporate Executive (3d ed. 1962) pp. 29-30. See also Steadman, *Increasing Management's Real Income Through Deferral and Stock Options* (1960) 15 Bus. Law. 764.)

Along with the general goal of structuring compensation favorably, other purposes accompany various benefit plans. "Bonus and profit-sharing arrangements may take various forms such as a stock purchase option for a certain period, a management stock-purchase plan, or an employees' stock purchase plan. The primary purpose of a company stock-option plan is the attraction and retention of executive, key or qualified personnel, and the granting of such option is considered a form of compensation . . . . The purchase of shares by the executive officers in connection with an employee stock-purchase plan which may give the privilege of obtaining shares on a large scale at less than the market price often amounts to a lucrative bonus." (5 Fletcher, *op. cit. supra,* § 2143.1, at p. 551.) A number of factors may prompt companies to use such alternatives, among them management's wish for a direct share in company profits, the possibility of increasing management's incentive and efforts, cutting taxes and providing security for the executive. (1 Washington & Rothschild, *op. cit. supra,* at p. 30.)

If any of the various purposes of stock option plans can be said to bear emphasis, it is probably that of providing incentive. "One of the most widespread programs for providing employees with additional incentive and creating an identification of interest between the company and the key employees is a stock option plan." (The Lawyer's Basic Corporate Practice Manual (ALI 2d ed. 1978) § 8.06, p. 130.) "Share options are a form of incentive compensation based on the idea that good management results in higher prices which render the share option valuable." (Henne, Corporations (2d

---

[3]The tax benefits to an employee of qualified stock option plans can be substantial, if the employer is a company with a high potential which is achieved by the time the options are exercisable. In Paul's case, for example, if Amdahl stock is selling for $20 when his options are exercisable he will pay only $1 or $5 (his option price), yet he will receive stock worth $20 a share, with no recognizable taxable gain. Presumably he will refrain from selling the stock until the gain qualifies for capital gains treatment. Thus, Paul will not only receive a substantial gain, but it will be taxed at the highly favorable capital gains rate, rather than the higher rate charged if the same sum were paid to him as salary taxable as ordinary income.

ed. 1970) § 248, p. 492. See also Steadman, *Stock Options and Other Executive Incentive Arrangements* (1959) 13 Vand. L.Rev. 311, 314-315.)

Consistent with the emphasis on incentive is the supposition that options are granted for future services, either primarily or exclusively. This proposition appears bolstered by the general rule that option agreements must ordinarily be supported by consideration, and that "[i]n practice, consideration will usually be supplied by the executive in the form of continued services." (2 Washington & Rothschild, *op. cit. supra,* at p. 575.)

Nevertheless, the temptation to conclude that options are earned exclusively by future services lessens somewhat in light of the flexibility and variety of option plans, as well as the size and circumstances of the offering company. "For the smaller company, for the company without substantial cash resources, for the company in distressed circumstances, stock options may provide a means of attracting strong management willing to render its services for modest current compensation in return for substantial future rewards on a tax-favored basis." (2 Washington & Rothschild, *op. cit. supra,* at p. 571.) Although the purpose of providing incentive remains in the latter situation (and such an arrangement may be geared to future services as well), the primary goal appears to be *deferring compensation for present services.* At the least, such a use of stock options seems consistent with providing compensation for *either* present or future services, just as would its use as a bonus, noted in the description above. Further, the incentive and future service emphasis of stock options diminishes somewhat in view of their ready susceptibility to modification, which frequently dissolves the distinctions among them. (*Ibid.*)

Finally, stock options may be used as additional compensation, *even for past services,* so long as to meet reasonable expectations as to such compensation which existed while the employee rendered the services. (2 Washington & Rothschild, *op. cit. supra,* at p. 578.) Also, although out of keeping with common business practice, companies frequently provide rewards or bonuses for past services. (5 Fletcher, *op. cit. supra,* § 2143, at p. 538.)

Thus, no single characterization can be given to employee stock options. Whether they can be characterized as compensation for future services, for past services, or for both, depends upon the circumstances involved in the grant of the employee stock option.

In the instant case, the trial court found that the stock option agreement arose from the standard corporate purpose of "attracting and retaining the services of selected directors, executives and other key employees and for

the purpose of providing an incentive to encourage and stimulate increased efforts by them." Since the options are keyed to periods of employment after the date of each grant, Paul argues that the options constitute compensation exclusively for future services rather than past or present services. For that reason, he says the period of employment prior to the granting of the option to him contributed nothing to earning the options and should be excluded from the time frame by which the court calculated its "time rule" allocation formula.

Treatment of the other types of deferred compensation suggest that Paul's contention relies too heavily on a single feature of the option agreement: the periods of time set as a prerequisite to exercising the options. Decisions applying the type of time rule in question have been willing to adjust the rule to the requirements of particular cases.

In *In re Marriage of Davis* (1980) 113 Cal.App.3d 485 [169 Cal.Rptr. 863], the court scrutinized a disputed 30-year military pension, concluding that the final 10 years of the employee-spouse's service contributed nothing to the retirement benefits since this period of service consisted of reserve duty rather than active duty. The court found that though the full 30-year period was required in order to receive benefits, the final 10 years were "merely a condition precedent . . . . The right to retired pay is earned solely by service on active duty." (*Id.,* at p. 489.)

In *In re Marriage of Poppe* (1979) 97 Cal.App.3d 1 [158 Cal.Rptr. 500], the court construed another military pension in a manner similar to the approach of the *Davis* court. The employee-spouse contended that all 30 years of his naval service had contributed to his pension despite the fact that the final 10 consisted of reserve duty. The court considered the fact that benefits were based on points—one point per day of active duty, one point per day for the two-week period per year served by reservists. The court concluded that "[a]pportionment on the basis of the time rule is appropriate only where the amount of retirement benefits is substantially related to the number of years of service." (*Id.,* at p. 8.) In this instance, the court noted, the benefits depended instead "on the nature and frequency of the service rendered." (*Id.,* at p. 9.) (Notably, the court actually did apply a form of the time rule here; it merely excluded the reserve-status time from the formula.) In allocating pension benefits between community and separate interests, therefore, the courts in both *Davis* and *Poppe* proceeded according to the nature of the services which gave rise to benefits as well as to the time spent in rendering them.

The fact that pension and retirement benefits ordinarily seem to be a function of longevity makes the so-called time rule especially appropriate to

allocating them. (See, e.g., *In re Marriage of Judd, supra,* 68 Cal.App.3d at p. 522; *In re Marriage of Adams, supra,* 64 Cal.App.3d at p. 184; *In re Marriage of Anderson* (1976) 64 Cal.App.3d 36, 39-40 [134 Cal.Rptr. 252]; *In re Marriage of Freiberg* (1976) 57 Cal.App.3d 304, 310 [127 Cal.Rptr. 792] [disapproved on other grounds in *In re Marriage of Gillmore* (1981) 29 Cal.3d 418 (174 Cal.Rptr. 493, 629 P.2d 1)].) As the courts in *Davis* and *Poppe* suggest, however, courts may look beyond the time requirements of benefit compensation in order to determine exactly how and when the benefits were earned.

Similar in their approach to analyzing deferred compensation are cases dealing with disability, layoff and termination benefits. In California, disability benefits, for example, are considered to have no relation to the recipient's prior service, but instead are seen as depending upon the employee's *status* as a disabled person. (*In re Marriage of McDonald* (1975) 52 Cal.App.3d 509 [125 Cal.Rptr. 160].) In *In re Marriage of Flockhart* (1981) 119 Cal.App.3d 240, 243 [173 Cal.Rptr. 818], the court refused to construe weekly layoff benefits payable after the parties' separation as community property, likening such compensation to disability benefits. Citing the lack of a contractual right to such benefits (as distinguished from retirement benefits) and emphasizing the purpose of layoff benefits as replacing lost income rather than as deferring income previously earned, the court refused to find any community interest in the benefits. (*Ibid.*; see also *In re Marriage of Wicks* (1978) 80 Cal.App.3d 329, 333 [145 Cal.Rptr. 496] [emphasizing recipient's status as uniquely qualified in a "critical specialty" over his previous military service as the key to receipt of reenlistment incentive pay]; cf. *In re Marriage of Skaden* (1977) 19 Cal.3d 679 [139 Cal.Rptr. 615, 566 P.2d 249] [termination benefits earned pursuant to an employment contract provision held to be deferred compensation earned by the community although paid after parties' separation].)

These cases amplify the message sounded in *Davis* and *Poppe* that in the context of marital property settlement the rights to benefits of various kinds derive from any number of sources. Benefits may be a function of longevity or time, or of the nature or frequency of services rendered. The receipt of benefits may be perceived entirely apart from any period of service and turn instead on the purpose for which they were created.

In the present case, Paul challenges the trial court's judgment for lack of findings as to the basis for applying the time rule in the manner it did. Specifically, he argues that the court failed to make appropriate factual findings to justify, including his first two years of employment at Amdahl, the time used to allocate the options in issue. He further argues that insufficient evidence was adduced at trial to support such findings.

By including the two years prior to the granting of the options in question, the trial court impliedly found that period of service contributed to earning the option rights in issue. (See *Elliot* v. *Jensen* (1960) 187 Cal.App.2d 389, 393 [9 Cal.Rptr. 642] [subsidiary findings necessary to support the judgment are implied].) Substantial evidence supports this finding. Prior to becoming employed by Amdahl, Paul had worked for IBM Corporation for nearly seven years, at which point his retirement benefits, according to Maria's testimony, would have vested. In this context, the timing of such a critical career move apparently led the court to infer that inducements offered by Amdahl to some extent replaced the benefits left behind at IBM. Additionally, as noted above, Amdahl's option plan was designed to attract as well as to retain key employees. The parties discussed the implications of Paul's jump to Amdahl, and the offer of stock in some form seems to have been a key inducement to making the move. These facts support an implied finding that the options were earned from the commencement of Paul's employment at Amdahl.

The evidence further shows that providing incentive was far from Amdahl's only purpose in granting the options. The record shows that Paul anticipated the options from the outset and that Amdahl, in part, likely granted them in lieu of present compensation during the initial period of Paul's employment, a time when Amdahl's success was limited. Assuming the evidence demonstrated to the court's satisfaction that option rights represented deferred compensation for present services, the court was justified in finding that the option rights were earned in part during the first two years.

Paul's objection to the lack of findings as to the basis for including his first two years at Amdahl in the allocation formula ignores the trial court's finding that cited his receipt "[o]n August 9, 1974, [of] one thousand (1,000) shares at a price of one dollar (1.00) per share in a nonqualified plan which replaced the 1,000 shares of the 11/22/72 grant of 1,000 shares at $20.00 per share." Paul and Amdahl mutually rescinded the 1972 agreement, the lack of increased value of Amdahl's stock having left that option worthless. As a substitute for the rescinded option, which was by any standard earned during the years 1972-1974, the 1974 agreement could be seen as the product of Paul's employment during those years. The abortive first option further demonstrates that the option rights constituted a vital part of Paul's compensation package from the very outset of employment.

Finally, Paul's claim of reversible error by the trial court's failure to fix the value of the option rights as of the date of separation seems confused in light of *In re Marriage of Brown* (1976) 15 Cal.3d 838 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164]. ██ There the court acknowledged

various difficulties inherent in the present division of contingent future contractual rights, but pointed out that it is appropriate to divide benefits as they are paid. (*Id.,* at p. 848.) There is no merit to Paul's contention that where benefits cannot be valued presently they cannot be divided. The reasoning of *Brown* and subsequent decisions flatly contradict this notion. (See, e.g., *In re Marriage of Judd, supra,* 68 Cal.App.3d at p. 520.)

■ In sum, the evidence supports a finding that the options were earned from the outset of Paul's service with Amdahl. The trial court impliedly arrived at this determination by considering the compensation scheme as a whole, including the implications of Paul's move from IBM and the place option rights occupied in the entire context of his service. Additionally, another option agreement took the place of the first, indicating that options were a critical feature in the total scheme of compensation. Paul's emphasis on the fact that the options, as is usually the case, became exercisable after specific periods of service subsequent to their granting diminishes in relation to the details of the entire employment circumstance.

Nothing in the makeup of the Amdahl stock option plan requires that they be construed as compensation exclusively for future services. Further, case law suggests that the time provisions of a compensation plan not be too literally construed, at least in the context of marital property, lest courts overlook the realities of when and how compensation is earned, as well as the purposes behind it. (E.g., *In re Marriage of Poppe, supra,* 97 Cal.App.3d 1.)

Apart from *In re Marriage of Judd, supra,* 68 Cal.App.3d at page 522, where the court found a "contingent stock account" amenable to allocation of the type effected by the time rule, no California case deals with employee stock options per se. In *In re Marriage of Wicks, supra,* 80 Cal.App.3d 329, the court analyzed a form of compensation—reenlistment incentive pay—which could arguably be analogous to stock options. The employee-spouse in *Wicks* began active duty as a military physician in August 1974 while the parties were married. He received an offer of incentive pay in January 1976 contingent on reenlisting. The parties separated in March or April of 1976 shortly before the husband accepted the incentive pay offer in June 1976. Concluding that the incentive pay was entirely the husband's separate property, the court pointed out that the pay was clearly awarded in exchange for future services. (*Id.,* at p. 333.) The court observed, "The only action pertinent to the variable incentive pay which occurred prior to the parties' separation was the convening of a selection board [to designate officers qualified for "critical specialties"] . . . ." (*Id.*)

Despite any similarity in the form of compensation involved, *Wicks* is not determinative of the issues involved here. The court in *Wicks* depended upon a clear statutory scheme to conclude that the benefits were without question compensation for future services. (*Ibid.*) No such explicit guidance is available here. Additionally, the employee-spouse in *Wicks* did not enter into the agreement which gave rise to the incentive pay until after the parties had separated. (*Ibid.*) Finally; the court in *Wicks* relied upon the fact that the pay involved was a function of the employee-spouse's *status*, his "critical speciality" qualification, rather than any form or period of service previously rendered. In the instant case the trial court interpreted the source and purposes of Paul's employee stock options differently, and the record amply justifies such an interpretation.

■ Courts have frequently pointed out that the disposition of marital property is within the trial court's discretion, by whatever method or formula will "achieve substantial justice between the parties." (*Tassi* v. *Tassi* (1958) 160 Cal.App.2d 680, 691 [325 P.2d 872]; see also *In re Marriage of Poppe, supra,* 97 Cal.App.3d at p. 11.) Similarly, " 'In making such apportionment between separate and community property our courts have developed no precise criterion or fixed standard, but have endeavored to adopt that yardstick which is most appropriate and equitable in a particular situation . . . .' [Citations.]" (*Beam* v. *Bank of America* (1971) 6 Cal.3d 12, 18 [98 Cal.Rptr. 137, 490 P.2d 257].) By this standard, the trial court did not abuse its discretion in allocating the options in issue.

■ In *In re Marriage of Brown, supra,* 15 Cal.3d 838, the court recognized that contractual rights to future benefits, though unvested and contingent, are property subject to allocation between community and separate interests. (*Id.,* at pp. 844, 846 fn. 8; see also *In re Marriage of Judd, supra,* 68 Cal.App.3d at p. 520.) In noting that various risks of loss or termination of benefits make division of such assets uncertain, the court pointed out that it is appropriate to award each spouse a portion of benefits as they are paid. This is precisely what the trial court contemplated in applying the time rule as it did in the present case.

■ Paul argues, however, that the shares awarded in connection with yearly increments beginning after the parties' separation are the product of his efforts exclusively. This contention ignores the treatment of contractual rights adopted by the court in *Brown.* The *Brown* decision mandates that the community's share of retirement benefits is to reflect the extent of the community effort in *earning the contractual right to receive those benefits.* (*In re Marriage of Judd, supra,* 68 Cal.App.3d at p. 522, citing *In re Marriage of Brown, supra,* 15 Cal.3d at pp. 851-852 (italics added).)

The employee-spouse's service after separation therefore does not alter the parties' qualitative interest in the contractual rights, regardless of any imbalance in rights arising either before or after the marriage. (*In re Marriage of Judd, supra,* 68 Cal.App.3d at p. 523; *In re Marriage of Freiberg, supra,* 57 Cal.App.3d 304; see also *In re Marriage of Fenton* (1982) 134 Cal.App.3d 451, 464 [184 Cal.Rptr. 597]; *In re Marriage of Andreen* (1978) 76 Cal.App.3d 667, 675 [143 Cal.Rptr. 94] [rejecting employee-spouse's argument that the community had no interest in benefits arising from his postseparation promotion].) It is well-established in California that the allocation of retirement benefits arising from contract rights accruing during marriage follows the rule that " 'the first few years of service (during the marriage) must be given just as much weight in computing total service as the last few years (after separation).' " (*In re Marriage of Judd, supra,* 68 Cal.App.3d at p. 523; quoting *In re Marriage of Anderson, supra,* 64 Cal.App.3d at p. 39.) Under the facts of the instant case, it was not an abuse of discretion for the trial judge to apply the same rule.

Paul cites *In re Marriage of Barnert* (1978) 85 Cal.App.3d 413 [149 Cal.Rptr. 616], and *In re Marriage of Imperato* (1975) 45 Cal.App.3d 432 [119 Cal.Rptr. 590], for the proposition that postseparation earnings and accumulations are separate property. However, he fails to acknowledge that the rule of separate property set forth in both cases is explicitly qualified by the requirement that such property is subject to rules of apportionment designed to allocate to the community its share of benefits realized after separation. (*In re Marriage of Barnert, supra,* 85 Cal.App.3d at p. 423.) The court in *Imperato* stated, "As we understand husband's argument, community property must be valued as of date of separation with all of the increase in value subsequent thereto passing to the spouse that devoted time and effort to its preservation." (*In re Marriage of Imperato, supra,* 45 Cal.App.3d at pp. 436-437.) This seems to be precisely the argument advanced by appellant in the case at bench. The court in *Imperato* rejected the argument since it ignored the usual growth in many investments. (*Ibid.*) Likewise it fails here because it ignores the community's interest in the growth potential of the Amdahl stock options.

Considering the frequency with which employee stock options are provided as part of key employee compensation packages, it is surprising that the allocation of community and separate property interests therein has not previously been addressed by California's appellate courts. Although we approve the use of the time rule fashioned by the trial court under the facts of this case, we stress that no single rule or formula is applicable to every dissolution case involving employee stock options. Trial courts should be vested with broad discretion to fashion approaches which will achieve the most equitable results under the facts of each case.

Undoubtedly there are other factual circumstances where the application of the time rule approved here would also achieve an equitable result. Analogizing to *Wicks,* it is possible that equity could require a determination that stock options are solely the separate property of the employee spouse. An employee spouse can be expected to make this argument as to options granted after the date of separation and certainly for any granted after the dissolution of the marriage. Since the community interest in the employee options under the time rule we approve, commences with the date of employment, four years before the granting of the options, it could be argued by a nonemployee spouse that options granted to the employee spouse four years after the dissolution has occurred would contain a community interest therein. We want to make clear that by approving the time rule fixing the community interest in Paul's options beginning at a point in time four years before he and Maria separated, when his employment commenced with Amdahl, we do not mean to imply that stock options Paul may be granted after the divorce will be subject to a similar time rule and therefore possess a community interest. That issue is not before us.[4]

We mention the foregoing alternatives to emphasize that the trial court should exercise its discretion to fashion an equitable allocation of separate and community interests in employee stock options exercisable by the employee spouse after the date of separation of the parties. We recognize that were we to adopt an inflexible rule, it might help litigating spouses and their counsel settle option disputes and, at the same time, provide an easy measure to be applied by trial courts. However, to do so would be to follow the recent tendency of appellate courts and the Legislature, which we decry, to adopt rules which on the surface are easy to apply and foster consistency yet, as applied, too often achieve inequitable results.[5]

---

[4]Claims of a community interest in employee stock options granted to the employee spouse after the dissolution of the marriage would appear too speculative and would lack the immediacy and specificity necessary for exercise of jurisdiction over them. (See *In re Marriage of Fonstein* (1976) 17 Cal.3d 738 [131 Cal.Rptr. 873, 552 P.2d 1169]; see also *Weinberg v. Weinberg* (1967) 67 Cal.2d 557 [63 Cal.Rptr. 13, 432 P.2d 709].)

[5]A recent example of appellate courts limiting trial court discretion by developing a simple and inflexible rule is *In re Marriage of Lucas* (1980) 27 Cal.3d 808 [166 Cal.Rptr. 853, 614 P.2d 285], which held that the separate property of one spouse placed in joint tenancy with the other becomes their community property, absent an agreement or understanding to the contrary. This is a simple rule, easy to apply, and inflexible. The difficulty with it is that it ignores normal human conduct in marriages and the fact that the transferring party usually acts without legal advice and with no understanding of the legal consequences while, at the same time, assuming that the marriage is going to last forever.

The apparently unforeseen inequities which resulted from this simple, inflexible rule caused the Legislature to enact anti-*Lucas* legislation only three years later. (See Civ. Code, § 4800.2.) At the present session of the Legislature efforts are being undertaken in the name of consistency to narrow and limit the discretion of trial courts in fixing child support. (See Assem. Bill No. 1527.) Such efforts, if successful, are just as certain to lead to inequitable results. The lesson to appellate courts and the Legislature should be that, subject to the

In the 200 years since the formation of our country, its incredible population growth and the increasing complexity of both our society and our government have virtually eliminated the ability of the executive and legislative branches of our state and federal governments to be responsive to the problems and concerns of the individual citizen. The beauty of our system of justice is that the individual citizen still enjoys the opportunity to have the judicial branch of government, at both trial and appellate court levels, focus exclusively on his or her litigation. A special benefit of a system which allows for equitable considerations, especially in the family law field, is to afford the judge before whom the litigants appear, subject to applicable legal principles, the opportunity to fashion a remedy which achieves a just result. While critics may claim this results in inconsistency, we believe the strength of the judicial system is enhanced when the judiciary possesses the ability in family law cases to tailor a remedy to fit the circumstances of the individual litigants before the court.

Finally, by approving a time rule allocating community and separate property interests in employee stock options in this case, we reach a result which continues Paul and Maria's joint ownership interests in the community options. We do not suggest that this will always be the proper method of distribution of employee stock options. For example, some stock options are publicly traded or can otherwise be valued, even though exercisable in the future. In either case, it would appear to be most equitable to fix the value of the community interests as of the date of separation and distribute the community interests to the employee spouse, awarding other community property of equivalent value to the nonemployee spouse in order to achieve the equal division of community property required by Civil Code section 4800, subdivision (a). Employee stock options are normally exercisable on the condition that the employee remain with the employer and, as between the spouses, that is obviously within the control of the employee spouse. Additionally, to whatever extent an increase in the value of the company stock results from the employee's performance, or a decrease in the value of the stock occurs because of the company's poor performance or the economy, or because the employee terminates his employment, the risk of such rewards or losses is best borne by the employee spouse.

 The trial court properly exercised its discretion in fashioning the time rule it utilized to equitably allocate the separate and community property interests in the Amdahl employee stock options. Paul's arguments to the contrary overlook the community interests in contractual rights earned during the marriage as a factor of employee compensation.

---

application of proper legal principles, because of the variety and complexity of factual circumstances which occur in marital relationships, trial courts should have broad discretion to achieve equity for the litigants who appear before them.

The judgment is affirmed.

Low, P. J., and Haning, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 27, 1984.