[No. A021066. First Dist., Div. Four. Feb. 4, 1986.]

In re the Marriage of MARY K. and HAROLD F. NELSON, JR.
MARY K. NELSON, Appellant, v.
HAROLD F. NELSON, JR., Appellant.

**[Opinion certified for partial publication.*]**

*Certified for publication except as to parts I, II and VII (Cal. Rules of Court, rules 976(b) and 976.1.)

152

**COUNSEL**

Stanley W. Smith and Niven & Smith for Appellant Wife.

Harold F. Nelson, Jr., in pro. per., for Appellant Husband.

OPINION

**ANDERSON, P. J.**—Appellant and cross-respondent, Harold F. Nelson, Jr. (hereafter Harold), appeals from portions of the interlocutory judgment dissolving his marriage to cross-appellant and respondent, Mary K. Nelson (hereafter Mary).

Both parties raise issues regarding property distributed in the judgment.

A large portion of the trial court's decree involved the characterization and apportionment of stock options issued to Harold by his employer, the Ampex Corporation.[1] These fell into three separate categories: those that were granted and became exercisable before the parties separated; those that were granted before the parties separated but were not exercisable until after they separated (hereafter the intermediate options); and those that were granted after the parties separated (hereafter the postseparation options). The first group was characterized by the trial court as wholly community property, the second partly community property and partly Harold's separate property (using a time rule) and the third wholly Harold's separate property.

Other property owned by the parties was characterized as follows: A one-half interest in a parcel of real property located in Maui, Hawaii (hereafter the Hawaiian property), was declared a community asset. The couple's house in Half Moon Bay, California, was also found to be community property. A year-end bonus paid to Harold six months after the parties separated was determined to be his separate property.

I.-II.*

. . . . . . . . . . . . . . . . . . . . . .

### III. *Intermediate Options Partly Community Property*

The trial court's statement of decision contains the following discussion: "The stock options owned but not exercisable as of the date of separation were in part community property for the same reason that a pension plan which is subject to divestment by termination of employment has a com-

---

[1] In the middle of the divorce proceedings the Ampex Corporation became the Signal Companies, Inc., as the result of a merger/reorganization. The options to buy Ampex stock were converted into options to buy Signal stock.

*Parts I and II of this opinion are not certified for publication. (See fn., *ante,* at p. 150.)

munity property aspect. They were granted for services rendered and to be rendered. . . . See *In re Marriage of Brown* (1976) 15 Cal.3d 838 and its progeny, particularly *In re Marriage of Judd* (1977) 68 Cal.App.3d 515.''

■ Harold disputes the trial court's finding. He does not attack the court's apportionment of the value of these options between community and separate property, but rather argues that they had no community aspect at all. In making this argument he relies primarily on the following assertions: that the options are not analogous to nonvested pension benefits, thus making reference to cases like *Brown* and *Judd* inapropos; that the options had no value before their date of exercisability, so that upon becoming exercisable they were postseparation earnings within the meaning of Civil Code section 5118; and in a similar vein, that the price of the Ampex Company stock must increase in value after the date of exercisability for the employee to realize a gain so the options reward only future rather than past efforts on the employee's part.

*In re Marriage of Hug* (1984) 154 Cal.App.3d 780 [201 Cal.Rptr. 676], refutes Harold's arguments: ''we hold that in marital dissolution actions the trial court has broad discretion to select an equitable method of allocating community and separate property interests in stock options granted prior to the date of separation of the parties, which became exercisable after the date of separation.'' (At p. 782.) Implicit in this statement is a recognition of employee stock option grants as ''not an expectancy but a chose in action, a form of property . . .'' susceptible of division in spite of being contingent or not having vested. (*In re Marriage of Brown, supra,* 15 Cal.3d at p. 845 [126 Cal.Rptr. 633, 544 P.2d 561]; *In re Marriage of Hug, supra,* 154 Cal.App.3d at p. 791.)

## IV. *Intermediate Options Properly Apportioned*

■ Mary argues that not only the above-cited holding of *Hug* should apply to this case, but also the formula for apportionment of the intermediate stock options as between community and separate property which it approved. There the number of options determined to be community was the product of a fraction in which the numerator was the period in months from the commencement of the spouse's tenure with his employer to the date of the couple's separation, and the denominator was the period in months between commencement of employment and the date when each group of options first became exercisable. This fraction was then multiplied by the number of shares of stock which could be purchased with each block of options, yielding the community figure. (*In re Marriage of Hug, supra,* 154 Cal.App.3d at p. 782.)

In contrast, the trial court here utilized a formula in which the numerator was the number of months from the date of grant of each block of options to the date of the couple's separation, while the denominator was the period from the time of each grant to its date of exercisability.

Our reading of *In re Marriage of Hug* convinces us that no modification of the trial court's formula for apportionment is necessary. *Hug* specifically states, "we stress that no single rule or formula is applicable to every dissolution case involving employee stock options. Trial courts should be vested with broad discretion to fashion approaches which will achieve the most equitable results under the facts of each case." (*In re Marriage of Hug, supra*, 154 Cal.App.3d at p. 792.) We find nothing inequitable in the formula adopted by the trial court; in fact, under the circumstances of this case it was probably a better method of division.[4]

## V. *Anticipated Taxation of Options Properly Credited*

It is clear from the face of the option grants that any gain realized upon their exercise is taxable as ordinary income. In recognition of this fact, the trial court ordered that the portion of the options valued as community property be reduced to reflect an assumed tax rate of 20 percent, and correspondingly credited Harold directly with one-half this amount. The court ordered, in addition, that should Harold actually realize a tax consequence in excess of 20 percent upon exercising any of the "community options," he would be credited for the further reduction in their value as community assets.

Credit for the increased tax rate would be limited to its effect on the community property value of the options as set forth in the interlocutory judgment. The court further ordered, "[i]n the event that the actual tax attributable to the exercise of the Ampex/Signal stock options is less than the twenty percent (20%) offset provided for above [$9,243.76], Respondent [Harold] shall reimburse to petitioner [Mary] one-half (½) of the difference between the actual tax attributable to exercise of the options and the amount of the offset provided for herein [$9,243.76]."

 Harold argues that the trial court should have offset the community property value of the options by 55 percent, his "more likely income tax

---

[4]The major difference we discern between the Ampex options and those before the court in *Hug* is that while both reward future productivity, the *Hug* options appear to have been designed to attract new employees and/or more generously reward past services. (*Id.*, at pp. 783, 789.) As previously discussed, only prospective increases in the value of Ampex stock could result in a profit to the Ampex option holders. It was therefore appropriate to place more emphasis on the period following each grant to the date of separation, as the trial court did here, than on the employee's entire tenure with the company up to the time of separation as the *Hug* court did.

rate," and eliminated the adjustment mechanisms cited above. In support of this he points out that the court, in assigning to him a tax loss carry forward as an asset, recognized his 55 percent incremental bracket. He states, "[i]f the court assumes realization of value [of the options], as it has done, it must also assume income taxation."

The case law does not support Harold's argument. ■■■ In distributing community assets, a trial court is obliged to consider tax consequences only where it is proven that an *immediate and specific* liability will arise upon the ordered division. (*Weinberg* v. *Weinberg* (1967) 67 Cal.2d 557, 566 [63 Cal.Rptr. 13, 432 P.2d 709]; *In re Marriage of Sharp* (1983) 143 Cal.App.3d 714, 718-719 [192 Cal.Rptr. 97].) ■■■ In the situation at hand, the time at which a tax liability may arise and the extent of that tax liability are exclusively within Harold's control. He is under no obligation as a result of the interlocutory judgment to immediately exercise the options. ■■■ "The trial court need not . . . consider tax consequences that may or may not arise after the division of the community property." (*Weinberg* v. *Weinberg, supra,* 67 Cal.2d at p. 566.)

■■■ This is not to say that the trial court erred in ordering that Harold be issued a credit against possible tax liability and establishing a mechanism for possible future credits. Civil Code section 4800 directs the trial court to divide community assets equally upon dissolution of a marriage, and where economic circumstances warrant to "award any asset to one party on such conditions as it deems proper to effect a substantially equal division of the property." (§ 4800, subd. (b)(1).) The special economic circumstance present in this case is the fact that the options are nonassignable and therefore had to all be given to Harold. The court's tax reimbursement formula was therefore a substitute for what, as it declared, would have been a more equitable distribution: "to divide them [the options] in kind and let each party be at the mercy of his/her own tax circumstance."[5]

### VI. *Postseparation Stock Options and Bonus Both Separate Property*

Mary maintains that in line with the principles of *In re Marriage of Brown, supra,* 15 Cal.3d 838 and *In re Marriage of Judd, supra,* 68 Cal.App.3d 515 [137 Cal.Rptr. 318], a portion of both Harold's grant of

---

[5]Harold also argues that the trial court's program of reimbursement is flawed because the value of the options could plunge, he could then exercise them, his tax liability would be very low because he would realize very little income, and yet he would be compelled to reimburse Mary the difference between his 20 percent allowance and the tax he was actually required to pay. We find this contention overly speculative and contradictory of the basic thrust of his argument, that the value of the options should have been further discounted.

1,750 Ampex stock options, received 25 days after the couple's legal date of separation, and his year-end bonus, received some 8 months after separation, is community property. The trial court ruled in regard to these assets, "[t]hose [options] which had not been granted as of separation are confirmed to husband as his separate property," and "[t]he Court is not persuaded . . ." by Mary's claim "that all or some portion of a $9,000.00 bonus received post-separation by Mr. Nelson [Harold] is community property because it was paid either in consideration for or in recognition of services rendered during marriage."

We recall for purposes of this discussion the trial court's explanation of why it characterized the intermediate options as partly a community asset. In its wording it expressly recognized the holdings of *Brown* and *Judd* that contractual rights earned wholly or in part during marriage, even if not vested at the time of separation, are partially community assets. We therefore conclude that in characterizing the postseparation bonus and stock options as Harold's separate property, it made the *factual* determination that these assets had not, even in part, accrued to Harold before his separation from Mary. ■ That being the case, our mandate on appeal is solely to determine whether or not there is support in the record for the trial court's findings under the previously set forth "substantial evidence rule."

■ Harold testified that he was granted the 1,750 postseparation options concurrent with his promotion to treasurer of Ampex, as approved by its board of directors on October 28, 1980 (25 days after separation). Like the previous option grants, the purchase price of each option was the fair market value of Ampex stock on the date of the grant; thus, as Harold testified, the value of Ampex stock had to rise *after* the date of grant in order for the grantee to realize a profit. Though Harold admitted that he knew of his impending promotion before separating from Mary, there is no indication that the board's ratification was a foregone conclusion. Also, Harold testified that there was no mention of the option grant before the board acted. From this it was reasonable for the trial court to conclude that Harold had no expectation of being granted this block of options and enjoyed no financial gain from them until after his separation from Mary.

In the case of the bonus, the strongest evidence that it was a guaranteed yearly form of compensation was the fact that Harold received one both in 1980 and 1981. He testified at one point, however, "[t]here is no contract associated with the bonuses. It's a decision is [*sic*] made yearly at the end of the year and I know only what I'm told." He also testified that some employees who had received bonuses in 1980 received lesser ones or none at all in 1981. The trial court had the option of believing this testimony and concluding that Ampex employees had only an expectancy of a year-end

bonus rather than a right to one contingent solely upon continued employment.

We therefore affirm the trial court's characterization of the 1,750 stock options granted October 29, 1980, and the $9,000 bonus paid in May 1981 as Harold's separate property.

### VII. *Attorney's Fees on Appeal**

. . . . . . . . . . . . . . . . . . . . . . .

We therefore remand this case to the trial court solely for the purpose of determining the propriety of awarding attorney's fees and costs on appeal. In all other respects the interlocutory judgment is affirmed.

Poché, J., and Channell, J., concurred.

---

*Part VII of this opinion is not certified for publication. (See fn., *ante,* at p. 150.)