[Civ. No. B009574. Second Dist., Div. Five. Feb. 5, 1986.]

In re the Marriage of BONNIE J. and CARLTON E. VANDERBEEK.
BONNIE J. VANDERBEEK, Appellant, v.
CARLTON E. VANDERBEEK, Respondent.

**COUNSEL**

Ross & Saunders and Anne-Marie Saunders for Appellant.

Jaffe & Clemens, Bruce A. Clemens, Maiden, Rosenbloom, Wintroub, Vogel & Fridkis and Miriam Tigerman Vogel for Respondent.

## OPINION

**WEISZ, J.**\*—On this appeal from an interlocutory judgment of divorce, we are called upon to examine the postmarital litigation of the parties to determine whether a proper division of the assets and debits of the community has been decreed. This case presents a variant on a recent area of interest—the community interest in arrangements between a key employee and the corporation with which he is associated which relate to future benefits. In a situation where the problem relates not to the present valuation of a future benefit, but rather the allocation *inter partes* of one that has become a detriment, we hold that great discretion must be given a trial court in devising an equitable allocation of debts to be paid as well as benefits to be enjoyed in future, and affirm the judgment below.

### FACTUAL BACKGROUND

Respondent Carlton E. Vanderbeek (hereinafter husband), while married to a previous spouse, co-founded a company known as Computer Communications, Inc. (CCI), a business that produces systems which interface small, remote computers with a large mainframe computer. In the mid-1960's, he acquired 4,000 of the original shares of CCI, and over a period of time he became a director of the corporation and its executive vice-president. At the time of the previous divorce, that community holding had grown to 15,700 shares valued at $38 per share, in addition to which it held an option to buy 2,000 shares at $1.25. In the property settlement agreement with the previous wife, a division was made in which she received 2,500 shares of CCI, while he retained the options as well as 13,200 shares. To equalize the division of property in the earlier community a payment of $125,000 to the former wife was required. These monies came by way of a 6 percent interest-bearing loan in the sum of $125,000 from CCI to husband, at one time secured by 8,000 shares of CCI stock.

The present marriage followed in short order in 1969. According to husband, they agreed beforehand that each would have no separate property but would "share and share alike," a very inviting proposal for the present wife at that time. Indeed, by 1970, the 2,000 shares stock option was converted into a $21,500 payment to CCI by husband (in that its options were bought back at the then-bid price of $12 per share, less the $1.25 option price and applied on the loan). Payment of the rest of the $125,000 loan was to be accomplished by way of extra compensation sufficient to retire the note and pay interest thereon, in the form of a consulting agreement entered into between CCI and husband in 1974. In 1978, husband purchased

---

\*Assigned by the Chairperson of the Judicial Council.

20,000 shares of CCI stock under a very similar arrangement, in that the purchase price (in form of a note at 6 percent interest) of $138,800 was to be paid via a consulting agreement.

In form, the parties executed an amendment to the 1974 consulting agreement, increasing the term and the compensation so that, over a period of 20 years, the amounts due thereunder would amortize and retire the two notes. As described in the annual reports to the Securities and Exchange Commission (SEC):

"Such agreements in effect require, among other things, that such officers be available to provide, at the request of the Company, up to 20 hours per month of consulting services from the time they leave the employment of the Company until the termination of such agreements. Such agreements provide for annual payments which continue notwithstanding the inability of the officers to perform consulting services because of their death or incapacity. However, the Company would not be obligated to make the payments if the officer did not provide consulting service when called upon to do so, other than by reason of his death or incapacity, or if he breached the other material covenants in his agreement.

"Prior to leaving the employment of the Company, the officers are not required by the consulting agreement to take on duties other than those imposed by reason of their employment as officers, although certain other consulting agreement covenants described below are in effect during employment. The annual consulting payments are in addition to the normal compensation of such officers while employed by the Company. These payments are equal to the annual payments on the respective notes and, in accordance with the agreements, will be automatically credited to the principal and interest owed to the Company under such notes. If each officer satisfies the obligations imposed on him by his consulting agreement, and if his annual payments under such agreement are made over the 20-year term of such agreement, such payments will be sufficient to discharge his obligations under his note to the Company. Each of the notes is secured by the payments due under the relevant consulting agreement.

"Taken as a whole, these stock purchase and consulting arrangements resemble stock bonuses in terms of the intention of management to reward and motivate key personnel. In addition, however, the Company has obtained certain covenants from the officers, as well as the right to obtain consulting services if they are no longer employed by the Company. Each officer's consulting agreement provides, among other things, (i) that such officer will be available to provide consulting services to the Company (the practical effect of this provision is to require such availability only after

employment with the Company ceases), (ii) that such officer will devote his best efforts to the affairs of the Company, (iii) that such officer will not disclose to third parties certain information concerning the operations of the Company, (iv) that any inventions or discoveries made by such officers during the term of the agreement belong to the Company, and (v) that the minimum payments are subject to increase if more than 20 hours per month are devoted to consulting services.

"Because the transactions were structured as stock purchases, with consulting payments designed to permit payment for the stock, the officers did not recognize taxable income upon purchase of the stock. Instead, amounts paid or credited to the officers under the consulting agreements will constitute taxable income to them, and the Company will be entitled to income tax deductions as and when such payments or credits are made to the officers over the 20-year period. If any officer fails to perform his obligations under his consulting agreement, the Company could cease to make the consulting payments to such officer, and such officer would be obligated to repay his note to the Company from other sources."

The fearsome fly in the ointment is, that the value per share of CCI stock has been downward. From $37 per share in the late 1960's, to $12 in 1970, to just under $7 in 1978, and then to less than $1 per share. The company was at the time of trial and has been since 1980 in a Chapter XI Reorganization proceeding, and unrestricted shares were selling at approximately $2.50 per share at trial time.

Thus, at the time of trial, the present community had 20,400 shares, which were held below to have a value of $30,000. These were assigned to the husband, along with the debts on the two notes payable to CCI, totalling $204,167. As against this negative amount, the 1974 consulting agreement was found to be a community asset worth $85,000, thus reducing the stock purchase and payment equity at time of trial to a minus $89,167 figure.

The marital community had valuable assets which were overweighed by debts. The largest was a tax liability assessed on priorly filed joint returns in the sum of $120,000; attorney's fees of almost $40,000, and debts to banks and individuals amounting to $25,000. Thus, against the approximate $275,000 in debts heretofore mentioned, the only items of value (apart from automobiles and household furniture and furnishings which were to be fairly evenly divided, valuewise), were a home valued at $215,000 and a ⅓ interest in Indio real property valued at $60,000. With credits of some $29,000 credited to husband for payments made after separation, we are left with what has been labeled as the "negative property" problem. Before we come to grips with that particular aspect of the case, the state of the

evidence with respect to the community property and liabilities must be discussed.

## SUFFICIENCY OF THE EVIDENCE

Appellant wife makes a series of attacks on the judgment herein, but the essential pivot upon which the battle must turn is the validity of the characterization of the property and debts in the judgment. Thus, we must look to the sufficiency of the evidence to support the judgment.

On the state of this record, it is only fair to state that almost any finding can be said to be supported by substantial evidence. The parties testified, as often they do in many respects diametrically opposed to each other; the experts differed; the inferences flew about in every direction. ■ There is support for a finding that the parties discussed a nonseparate property agreement prior to marriage and there is an abundance of testimony that all their behavior postmarriage was in accordance therewith. (*Estate of Cummins* (1955) 130 Cal.App.2d 821, 827-828 [280 P.2d 128]; *Durker* v. *Zimmerman* (1964) 229 Cal.App.2d 203, 207 [40 Cal.Rptr. 227]; *In re Marriage of Dawley* (1976) 17 Cal.3d 342, 356 [131 Cal.Rptr. 3, 551 P.2d 323].) Far more compelling is the fact that the first stock involved was worth $37 per share at the time of the marriage; that all payments of any kind were made from a joint account into which all monies from stock sales or earnings were placed; and the stock was sold and the proceeds used for community purposes. ■ With such evidence, the court could easily find that the stock position remaining from the earlier marriage, as well as the debt therefor, was community in character. Much more clearly, the later stock purchase and the concomitant debt, are also community property.

There is not only basis in the evidence for characterization, but also for a broad range in value. The evidence discloses that husband bought stock, via the loan method detailed heretofore and the exercise of options, at every opportunity; that at one time, at least, a possible buy-out or merger was contemplated and the later stock purchase transaction and consulting agreements responded thereto; the consulting agreements were characterized as both valid and subsisting, and also challenged as illegal and unenforceable. Thus, the record shows that the community had the advantage of the CCI stock, the price of which ranged from $48 to less than $1. The chronology shows that the stock was highest during the earlier days, declining throughout; the advantage turned quite sour. Interest payments came initially from the $21,500 option transaction, and then via credits rising from the consulting agreement. The remainder is the debt still owing to CCI, reduced by the value, if any, of the consulting agreement. Since there is highly substantial evidence of the debt, we turn to the consulting agreement.

CHARACTER AND VALUE OF THE CONSULTING AGREEMENT

As indicated, after the option-fueled payment of $21,500 in 1970, the basic manner of retiring the debt of $125,000 incurred in 1969 was by way of the 1974 consulting agreement. With the second loan in 1978, that agreement was amended by another instrument of that year, which increased the amount and extended the date for completion, in order to cover, and retire, the new loan. Husband will be relieved of the debt if he continues to work for the corporation until 1998 and fulfills the other requirements set forth in the 1974 agreement.

The agreement requires personal services on his part, which are to be rendered to the corporation for some 16 years after separation and are certainly separate property within the ambit of section 5118 of the Civil Code. On the other hand, the salary which he is paid was raised, in 1974 and again in 1978, in an amount which exactly amortizes the debt. Whether, and to what extent, those raises are essentially a wash-out; whether and to what extent they precluded any other salary increases either to cope with inflation or compensate for the difficulties of Chapter XI regulation, or salary decreases due to the corporate financial situation; and whether and to what extent the 6 percent interest rate on the notes should be valued are extremely difficult questions at best. There is no question at all that the monies applied to the debts are income to husband, and that the tax impact may continue until 1998 or, as apparently occurred with others, the agreement is abrogated. In that event, another tax impact must be evaluated.

Within this context, and having taken into account the advantage to the community of the amounts already paid via the agreement, the trial judge held that the 1974 agreement was community property, worth $85,000, and charged that amount to husband. The judgment states that the 1974 agreement is a personal services contract. Immediately thereafter, the judgment confirms the 1978 amendment as separate property of husband.

This challenged portion of the judgment is somewhat confusing. While in form the 1978 agreement is merely an amendment to that of 1974, they can be treated either as a single agreement or as two separate ones. Either way one views it, the essential similarity is so great, and the function so like, that this separate treatment is anomalous.

The record indicates that appellant's witness, a certified public accountant, valued the consulting agreement as a single unit, and was of the opinion that it had a calculable value of at least $84,235. Respondent's witness, also a certified public accountant, valued the composite consulting agreement at zero. The value found is supported by substantial evidence.

Respondent, who did not cross-appeal, insists that since the consulting agreement is denominated as a personal service contract in the judgment, it must be the separate property of husband. In *Garfein v. Garfein* (1971) 16 Cal.App.3d 155 [93 Cal.Rptr. 714], the problem related purely to earnings of the wife under a long-time contract with a major motion picture studio. Pursuant to the "play or pay" contract, she was obligated to appear in one feature picture each year but was to be paid whether she was called upon to do so or not. The case held that, after separation of the parties, the annual payments were earnings and therefore separate property, even if she were not called upon to furnish any services. In this instance, however, we are not concerned with the earnings, and no contention is made that they are other than separate property of the husband after the parties had separated. The question is whether the special features of the contract in respect of debt retirement, which were accrued during the time that the parties continued to live together, have a special value which can be characterized as community property.

As indicated in the prior discussion, there are indeed many elements in the consulting agreement which are unusual by reason of the executive or key man position occupied by husband with respect to CCI. Such agreements have now come under greater scrutiny, and particularly in the dissolution context. In *In re Marriage of Hug* (1984) 154 Cal.App.3d 780 [201 Cal.Rptr. 676], the court was considering the problem of stock options granted a husband who was also a key executive in a large computer corporation. The options were granted prior to, and could only be exercised after, separation. The case held that an allocation between husband and wife was proper. Thus, both community and separate interests inhered in the transaction.

The courts recognize that certain persons have special value and equally special bargaining power with respect to the employing corporation. In our case, Mr. Vanderbeek was a founder of the corporation, an officer and a director, and apparently active in the research and development aspects of a relatively new field. While his situation was not one involving the more common executive benefits (e.g., bonus, profit sharing, health and welfare benefits, incentives based upon profits, deferred compensation, pension rights, stock options—see *In re Marriage of Hug, supra,* 154 Cal.App.3d at pp. 784-788), there is no question a lesser employee would not have the same contract offered him. One can see that, like other key employee benefits, a consulting agreement of this sort has value elements other than mere compensation.

Trial courts have especially difficult issues coming before them in such cases as this, where future events are involved with respect to a right grant-

ed by contract or otherwise during the marriage period. Where the right is indeed vested in a form where it seems likely to mature ever more fully as the husband remains with the corporation, the possibilities had been charted with reasonable clarity (see *In re Marriage of Brown* (1976) 15 Cal.3d 838, 848-849 [126 Cal.Rptr. 633, 544 P.2d 561, 94 A.L.R.3d 164]; *In re Marriage of Gillmore* (1981) 29 Cal.3d 418, 425-427 [174 Cal.Rptr. 493, 629 P.2d 1]; *In re Marriage of Judd* (1977) 68 Cal.App.3d 515, 522 [137 Cal.Rptr. 318] as to pensions; *In re Marriage of Ames* (1976) 59 Cal.App.3d 234, 238 [130 Cal.Rptr. 435] as to profit-sharing; *In re Marriage of Judd, supra,* 68 Cal.App.3d 515, 526; and *In re Marriage of Hug, supra,* 154 Cal.App.3d 780, 792-793 as to stock options), the present situation seems to stand alone. Whether we choose to call it an allocation or a valuation, or both, is of little consequence. Under the rules set forth in *In re Marriage of Brown, supra,* 15 Cal.3d 838, which we hold must be applied here, it would appear that the trial court very properly and sagely utilized its discretion in allocating a credit of $85,000 to the community by reason of the benefits contained within the consulting agreement which are not actual compensation for the future services of husband. Taking the community property consisting of stock, debts owing with respect to stock, and the community position of the value of the consulting agreement together, an equitable result is had, and we must affirm that exercise of discretion. (*In re Marriage of Hug, supra,* 154 Cal.App.3d at p. 794.)

### DIVISION OF PROPERTY AND DEBT

■ Wife contends also that the community property was not equally divided. As she claims (assuming an equal division of the household items between the parties), the interlocutory decree awards her only a Datsun automobile valued at $3,325, whereas husband received other assets (the $85,000 community value of the consulting agreement, $215,000 in the form of the family home, $60,000 interest in the Indio property, $30,000 of CCI stock as the main items) worth over $390,000. She is essentially quite correct, but husband also was charged with the community debts in an amount of $370,000 and credited with payments made after separation with his postseparation earnings upon community debts of $29,000, such that his is actually a negative balance.

Where the community property, realistically viewed and valued, is insufficient to cover the debts due thereon, it is generally impossible to distribute equally as required. (Civ. Code, § 4800, *In re Marriage of Eastis* (1975) 47 Cal.App.3d 459, 464 [120 Cal.Rptr. 861].) At some point, reality must

triumph over theory, and under this coercion the deficit must be apportioned according to ability to pay. Nonetheless, the balance must be a clear one.

This court has had occasion to warn of the need to adhere to the equal sharing rule when the community assets were in some manner insufficient in order to curb what was a growing tendency to misuse the spousal support obligations as a guise to pay past due community debts (*In re Marriage of Chala* (1979) 92 Cal.App.3d 996, 1000-1003 [155 Cal.Rptr. 605]; *In re Marriage of Marx* (1979) 97 Cal.App.3d 552, 557-559 [159 Cal.Rptr. 215]) or to improperly value lien-secured obligations in a manner which results in an unequal division (*In re Marriage of Barnert* (1978) 85 Cal.App.3d 413, 421-422 [149 Cal.Rptr. 616]). Here, except with respect to characterizations and valuations which are supported by substantial evidence, wife contends only that she is left with very little (her car and one-half of the household furniture), while husband has the family homes, the Indio property, the CCI stock, and miscellaneous other property as well as a car and furniture. She does so by ignoring the fact that the debts are so huge and must be dealt with, the family home must be sold, that the Indio property interest must be liquidated, and that the tax liabilities must also be fully ascertained and paid. As with most liabilities, interest is a necessary problem that must be faced, as well as maintenance of property prior to sale, negotiating with creditors, and scheduling payment. All these were placed upon the husband, since he had not only the greater ability to pay deficits, but also the greater background and experience to dispose of the assets and negotiate with creditors.

So long as its action does not cause an unequal division of the community property, a large measure of discretion must be reposed in the trial court as to which party will receive the various assets and debts. Courts are required to assure what seems fair on its face, is so in practice. Thus, in the case of *In re Marriage of Tammen* (1976) 63 Cal.App.3d 927 [134 Cal.Rptr. 161], the wife was awarded the community home, resulting in $19,820.80 more than her equal share. To balance, the court ordered her to execute a note at 7 percent interest secured by a second trust deed, in favor of the husband. Reversal followed, for the simple reason that such a note was clearly not worth its face value. Faced with a somewhat different but very analogous situation, we held in *In re Marriage of Herrmann* (1978) 84 Cal.App.3d 361, 366-367 [148 Cal.Rptr. 550] that awarding a house to the wife balanced by a promissory note to the husband in that manner was improper, even to retain proper housing for the children. We held that the situation required a more fitting solution to the practical problems presented, stating as we must again that "the trial courts must have wide latitude in which to

exercise their discretion."

Considering the problems relating to sales of real estate, negotiation with the Internal Revenue Service and perhaps with CCI dependent upon its economic situation which is apparently still unresolved, the fact that this is a so-called negative community and that husband clearly has the greater background in business and the greater ability to pay any debts in excess of assets, the exercise of discretion in this instance appears to be the result of sound balancing of the various factors involved.

### THE 1981 TAX PROBLEM

Wife complains loudly with respect to an unresolved issue; namely, the income tax liability for the year of 1981. In that, she is correct. We find that the judgment suffers as a result of poor draftsmanship on the part of counsel for the respondent.

Interlocutory decrees are important documents, invariably drawn by counsel. Where the parties or counsel are either deliberately or unintentionally uncooperative even the best drawn document is insufficient to prevent difficulty. The record reflects that the trial court had a very definite opinion on the cooperation in this case, reflected by his statement that "[t]his has been nothing but a delaying thing on the part of the petitioner, and any orders that he [counsel for respondent] needs to try and settle these tax problems . . . and she has fought that at every turn, and I will sign whatever orders you propose that may facilitate clearing up of this negative estate. It is a sad thing."

Counsel did not meet or confer on the form of judgment; husband's counsel prepared a form of judgment and asserts he was rebuffed in all efforts to confer; wife's counsel prepared her own version of judgment. This type of behavior can be wasteful, for it causes losses to the parties by way of unnecessary effort, places greater burdens on the already beleaguered trial courts, and accomplishes little. As noted by the trial judge, lack of intelligent cooperation for mutual benefit is a sad thing. The purpose of the interlocutory decree is to set forth the various items that must be faced to accomplish the aims of dissolution: support and custody issues, valuation and distribution of property, and retirement of community debt. As seen by the trial judge, and indicated by him, it was necessary that the husband be required to liquidate all of the assets other than cars and furniture, and to pay all of the debts.

Wife objects, claiming error in that husband is not ordered to "pay," but only to "assume" community debts; that the portion of the judgment dealing with taxes relates only to the "joint tax returns of the parties" and "joint obligations" for taxes, and that the 1981 tax liability is not adjudicated because the returns for that year were separately filed. It is clear from the judgment, taken as a whole, that the husband was to carry the entire burden of the past, not merely to the extent of the community property but entirely, and is required to do so after exhaustion of the assets by his superior earning ability. Thus, he was not only to pay spousal and child support, but was expected to make any repairs to the home required to command a fair price, to deal with the tax obligations including interest and penalties, and clear up the problems of a failed tax shelter.

Wife's claimed fears are probably groundless; it is doubtful she will be a target for creditors. She has little real exposure in any event, the major creditors (CCI and IRS) being owed amounts that are astronomical in view of her resources, and her assets being such that she is almost judgment proof[1] (Code Civ. Proc., §§ 703.070, subd. (a), 704.010, 704.020), while he is a far more appealing target.

In order to assure that the distribution scheme was properly carried out, the judgment contains a reservation of jurisdiction. At least five paragraphs mention that there is to be a "final division of property" pursuant to paragraph No. 33 of the judgment. Paragraph No. 33 is entitled "Final Accounting" and reads as follows:

"FINAL ACCOUNTING

"33. The court finds that the liabilities which are Respondent's responsibility hereunder exceed the assets received by Respondent hereunder. In view of Petitioner's lack of assets, the court finds that it is equitable that Petitioner has no other liabilities and therefore makes no order or charge to equalize for any excess liabilities over assets which Respondent receives hereunder. The court deems that all prior temporary orders are satisfied and superseded by this Judgment."

Taken together with the remainder of the document, it is manifest that the wife was to have *no* liabilities arising from the marriage during the time

---

[1] Except for a diamond ring awarded wife as her separate property, which would have a value above the exemption provided in Code of Civil Procedure section 704.040, the wife's assets would not be worth pursuing.

prior to separation, and all debts were to be the responsibility of the husband. Despite the heading which betokens a final accounting, and the provisions elsewhere that husband was to receive credit for paying various debts at the time of the final accounting, paragraph No. 33 fails to specifically provide for such an accounting.

It is possible that this was not really an oversight. The court was certain that the liabilities exceeded the assets, such that little practical purpose would be served by determining how much more than expected he would be required to pay. Some of the items here involved were open-ended, i.e., paragraph No. 31 required husband to be responsible for any fees or liabilities incurred with respect to lawsuits brought against him "in connection with employment related matters occurring during the marriage and prior to the date of separation (par. 29 of the judgment, involving two lawsuits then pending), while others were not. ■ According to appellant wife, this appeal is prompted by her fear of creditors, that husband was ordered to "assume" debts rather than to "pay" them. While we consider this quibbling in view of the cases (*Wright* v. *Lowe* (1956) 140 Cal.App.2d 891, 895 [296 P.2d 34], holding that "[t]o 'assume' ordinarily means 'to pay'"), there can be no doubt that the expressed intention to have a final accounting was not brought forward as very apparently was expected. ■ It seems very possible that, somehow, this provision was eliminated for fear that it would render the judgment less certain. Retention of jurisdiction is a valuable and resilient tool to accommodate difficult cases where future events must be taken into account (see, e.g., *In re Marriage of Herrmann, supra,* 84 Cal.App.3d 361, 367) and where further consideration of all the equities is of importance. The retention of jurisdiction to carry forward the judgment, as was done here in respect of a power of attorney and a deed to awarded property, is inherent in the dissolution process and found in the legislation governing dissolution. (Civ. Code, § 4380.) For some purposes, an actual reservation of jurisdiction is necessary, but not for others. In this instance, it appears that the court sought to reserve jurisdiction as for a final accounting, as a coercive tool to both parties and to ensure that the debt liquidation was promptly carried out. For that reason, we shall add to paragraph No. 33, after that portion of the paragraph that states that "it is equitable that Petitioner has no other liabilities and therefore makes no order or charge to equalize for any excess liabilities over assets which Respondent receives hereunder," the following sentence: "Jurisdiction is reserved to undertake a final accounting with respect to any such liabilities arising from the marriage, and to carry out the orders of this court with respect thereto." This carries out the expressed intention of the court below and, even if regarded as a modification rather than merely a clarification, is justified by the record. (*Harris* v. *Dixon Cadillac Co.* (1982) 132 Cal.App.3d 485, 490 [183 Cal.Rptr. 299, 23 A.L.R.4th 265].)

As so modified, the judgment is affirmed. Each party is to bear their own costs on appeal.

Feinerman, P. J., and Ashby, J., concurred.