[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. The Dissolution of the Marriage
It is found that all of the allegations of plaintiff's complaint have been proven, that the marriage has broken down irretrievably, and the marriage is ordered dissolved for that reason.
II. The Marital Assets or the Parties
 Plaintiff
 One-half interest in No. 715 Chestnut Hill Rd., Glastonbury, Ct., presently in foreclosure
 Total Value $317,500 Less Mortgage 375,000 -------- Total Equity 0 one-half interest 0 ---
 Checking account (not included on F.A.) 1,000 Mercantile Bank — savings 15,684 Life Insurance thru employer F.V. $200,000 C.S.V. --- thru Met. Life F.V. 408,000 C.S.V. --- 401K Plan 25,358 I.B.M. pension 101,636 C.T.G. pension --- Vested stock options 49,775 Unvested stock options — see article VI 0 ------ Total $193,453
Defendant
 One-half interest in equity in No. 715 Chestnut Hill Rd., Glastonbury, Ct. --- 1983 Avanti $ 2,000 Household furniture --- Glastonbury Bank Trust Co. c/a 84 I.B.M. Credit Union j/a --- Merrill Lynch 6,429 Life Ins. Mass. Mutual F.V. $10,000 CSV 3,634 Cemetery plots --- Cash 5,000 ----- Total $17,147 Total Marital Estate $210,600
III. A Review and Evaluation of the Evidence in Accordance with the Provisions of Sec. 46b-81c C.G.S.
CT Page 631
The plaintiff husband, who is forty-eight years old, and the defendant wife, who is forty-nine, were married on January 23, 1972, twenty-four years ago. There are no children issue of their marriage. This dissolution action was instituted on May 27, 1993, three and one-half years ago. Plaintiff presently resides in St. Louis, Mo., and defendant in Worcester, Mass.
Early History
The parties first met in 1969 at a compact packaging company in the Boston area where both were employed. Defendant had previously graduated from Champlain Junior College in Burlington, Vt. with an A.A. degree, while plaintiff at that time was in his senior year at Boston College, where he was majoring in computer science with a minor in accounting. After a conventional courtship the parties married on January 23, 1972. The pre-marital assets of the parties were minimal. The couple moved to Marlborough, Mass. with plaintiff continuing his employment at I.B.M. and defendant commencing work at Computer Leasing. Two years later they purchased a condominium in Boylston, Mass. where they resided until 1978 when plaintiff was transferred by I.B.M. to New Jersey with a promotion to the position of project manager. Defendant also obtained office work there which she later discontinued at plaintiff's request.
For the first ten years of their marriage the parties were happy and the marriage successful. Plaintiff's working hours and salary continued to increase while defendant, in addition to performing all household duties, devoted countless hours overseeing construction of their new home in Parsippany, New Jersey. She arranged the placement of topsoil, obtained price estimates, located special materials, placed a leaf blower on her back and kept the lawn and driveway clear. To this point it was a good team, a successful partnership.
Conflicting Views on Raising a Family 1972-1982
While the subject of having children arose early on in the marriage, the parties have differing views concerning conclusions reached on this issue.
In his testimony plaintiff stated that "we had discussed children. Neither of us wanted them. We practiced birth control. We never changed our minds." Defendant's recollection was CT Page 632 somewhat different. She stated that "when we lived at Park Road (in New Jersey 1977-1978) I suggested planning for a family. He said he didn't want to be distracted by children and wasn't ready for them."
At any rate both parties ceased taking any precautions in 1982 with the result that defendant became pregnant. Not surprisingly the testimony of the parties differs too on the subject of the subsequent abortion. Plaintiff stated that "I didn't want the child but made it clear that it was her decision. She had the `knob of the bat.' If we had this child the marriage would have gone on as before. We never changed our positions on children." Defendant in turn testified that "I felt my pregnancy was God's way of giving him a little nudge. I was happy. He laughed and said it was great to find the equipment worked. When he then brought up the abortion issue I was shocked. In the following days and weeks many arguments followed. Once he said `if you have the child, you'll be responsible for it on your own.' He made the arrangements for the abortion and at the same time I had a tubal ligation. Today my decision is still painful. Of course I regret it. I had a price to pay with God."
Employment History and Residential Changes 1978-1993
From 1978 until 1985 the parties resided in Parsippany, New Jersey — for the most part in a home which they had built and furnished. Plaintiff continued his long hours and steady progress at I.B.M. while defendant spared no effort in contributing to the well-being of the couple. She entertained large crowds of her husband's business associates, became active in community affairs, served on the local zoning authority. In addition she worked part-time as a volunteer in a florist shop, receiving training in floral design in return for her efforts.
In late 1985 plaintiff was offered and accepted the position of branch manager of I.B.M. in Hartford. The family home in New Jersey was sold and a new home purchased on Juniper Lane in Glastonbury, Ct. Both parties contributed to the renovation which followed. In plaintiff's words "I did the labor, she did the running around." Defendant expressed a somewhat different view in stating that "I worked like a man and he treated me like a man." After the parties had lived there for eight months and were about to relax, plaintiff was offered the position of branch manager in Manhattan, N.Y. He considered it an interesting challenge. Defendant understated her own opinion on this subject by offering CT Page 633 "to me moving is very tiring. Needless to say, plaintiff went to New York while defendant remained behind for several months making all arrangements for the sale of their house, preparing it for the new buyer and moving the family furniture back once more to New Jersey where the parties had bought a large house in Verona.
Plaintiff's enthusiasm for his Manhattan challenge was short-lived. He described his feelings about his new job in late 1987 as follows: "I was in over my head. It was stressful. I couldn't do it. We decided I'd try to get my old job back in Hartford. My wife was very supportive." I.B.M. agreed to plaintiff's retransfer, and the parties moved still another time back to Connecticut where they purchased their present home on Chestnut Hill Road in Glastonbury. The parties occupied their new home at Thanksgiving time, 1988.
In 1989, not long after their most recent move, plaintiff became apprehensive about his future with I.B.M. He discussed with defendant the possibility of going into a business which would capitalize on their talent in renovating houses. Plaintiff testified that defendant preferred to open a florist shop, but that he felt any successful endeavor should utilize the skills of both of them. Defendant on this issued testified that "I didn't consider it a wise investment. I told him he was on his own if he did it. I signed because I wanted peace and quiet." The consequence was that the parties invested $200,000 in a corporation formed for the purpose of constructing residential homes. Shortly thereafter the local real estate market collapsed, and the builder with whom the parties were associated went bankrupt. To make matters worse they had refinanced their house mortgages to underwrite their venture, were now unable to continue making the required payments thereon, and their family home presently is in the final stages of a foreclosure action.
In 1990 plaintiff ended his involvement with I.B.M. because of his concern that the company was about to "downsize." Following two separate and short periods of work with small computer oriented companies, plaintiff began his present association with C.T.G. Inc. in 1991 when he was appointed branch manager in Hartford.
This dissolution action was instituted in May, 1993 and plaintiff left the family house about three months thereafter. CT Page 634
Plaintiff and his girlfriend presently reside in St. Louis, Mo. where he is regional vice president of C.T.G., a successful concern which offers computer professionals for hire. His current financial affidavit reflects gross weekly earrings of $2308 with a weekly net after the usual deductions (omitting 401K contribution) of $1442. He has also received substantial incentive bonuses and stock options over the years. In his testimony on this subject he stated that "my current annual basic pay is $120,000 plus $30,000 in bonuses if I reach certain objectives." His two most recent I.R.S. W-2 forms reflect total employment income of $140,724 in 1994 and $134,534 in 1995. The subject or plaintiff's stock options will be discussed in greater detail in a later article.
Defendant, who currently remains unemployed, lives alone in a small four room apartment in Worcester, Mass. She has been receiving $750 per week in alimony pendent lite from plaintiff since August 8, 1995.
Health
 Plaintiff
A review of the court's notes reveals only that plaintiff, while at his last Glastonbury home (1988-1993) twice visited an orthopedic surgeon, first for the removal of a growth on his foot and later for treatment of an aggravated tendon in his right arm. Plaintiff appears to be in reasonably good health.
Defendant
While defendant was in good health at the time of her marriage in 1972, she has developed over the subsequent years several physical problems which require extended comment.
In 1973 defendant had an ovarian tumor surgically removed and in 1982 she underwent an abortion, having at the same time a tubal ligation. Describing this experience and her present childless existence in her courtroom testimony she stated "today my decision is still painful. Of course I regret it."
In 1987 while carrying laundry at their Verona, New Jersey home, defendant fell and fractured her skull. She spent more than a week in the local hospital, four days of which were in the intensive care unit. Some after effects of this injury she CT Page 635 describes as remaining to this day. She describes her present health as follows: "I'm very weak. I have severe headaches. I need to rest and I need to wear glasses. I have depression that requires medication. I have carpal tunnel in both wrists. On my worst days I can't get out of bed. On a bad day I can't sleep. I never have extended uninterrupted sleep. I can cry for days. On my best days I can accomplish something. I do lie down in the afternoon. By 8 P.M. I have no more stamina." She added that she had last seen a neurosurgeon in 1992 and an endocrinologist one month before this trial. At the present time she makes regular visits to a Dr. Brady, a psychiatrist.
During the trial defendant listed four different drugs which she takes daily for her various complaints.
In concluding her testimony on her diverse health problems defendant stated that "I have a lot of trouble concentrating. I forget to sign checks. I make mistakes with words. I say `envelope' for `elevator.' I didn't have this problem before the injury. These complaints started immediately after the fall."
While defendant offered no expert medical testimony on this issue, plaintiff confirmed that the abortion and fall had occurred, adding that he was responsible for the neurosurgeon treating her as quickly as possible. This court reviewed defendant's testimony on her various ills as worthy of belief.
Fault
This court has in the past found it helpful to review all of the evidence on this factor and to highlight the views thereon of each of the parties before reaching its conclusion. Such practice will be continued here.
Plaintiff
In the spring of 1983 plaintiff became emotionally and sexually involved with a fellow employee at I.B.M. This relationship continued until autumn, 1984. Defendant became angry and distraught when she learned of plaintiff's infidelity, and divorce was discussed. In plaintiff's words "I finally decided I had made a mistake, that we loved each other. I apologized, and we went on with our lives."
No significant marital problems arose thereafter until 1990 CT Page 636 when, in plaintiff's words, "feelings between my wife and me became acrimonious. I heard how stupid I was to go into the house construction business. I got zero support in this endeavor. We had alienated our families and had very few friends. I was the bad guy. This continued until the time I filed for divorce in May, 1993." The record indicates that plaintiff left the family home in August, 1993, moving in with his present girlfriend. A brief but unsuccessful reconciliation occurred in autumn, 1993. Plaintiff and his friend presently reside together in St. Louis, Mo.
Defendant
Before beginning her testimony defendant produced as witnesses on her behalf three cousins of plaintiff and their wives, all of whom without exception spoke in glowing terms of defendant's attentiveness to plaintiff and of her many fine qualities as a wife and friend. A quick review of their testimony reveals the following quotes: "She was supportive of her husband in every way." She was always concerned whether he was happy." "She was one of the best hostesses ever." "I never heard her belittle him." "I always thought she took great care of him." Plaintiff's relatives were somewhat less enthusiastic in describing him, using such phrases as "he made derogatory remarks about her — said she was not smart enough." "He never helped her clean up after dinner." "He talks down to everyone." "He is not an affectionate person." One quote in particular summarizes the feelings of plaintiff's close relatives about both parties "one good thing about him (plaintiff) is he got her (defendant) in the family."
A note of the court concerning defendant's view of household tensions serves well as a microcosm of this marriage. She at one point testified that "after the cleaners were there, he would take out a ruler to see how far the furniture was from the wall. I told him he was unreasonable and unrealistic. If I said anything he would make me feel inferior. Then I'd try harder. It became a vicious circle."
Referring to plaintiff's affair with a fellow employee in 1983 defendant testified that "I felt betrayed. I told him I wanted a divorce. He said he needed me and didn't want the marriage to end. I changed my mind. Afterward he bought me a $36,000 Avanti." CT Page 637
For all intents and purposes, the marriage ended on March 30, 1993 when plaintiff advised defendant he was filing for divorce On that note defendant stated "he said he didn't want the responsibilities of a wife and home, that after my head injury I was not as sharp as I used to be. I suggested counselling but he said he didn't need it. After he moved out he told me he had a girlfriend. He said he had become lonely when I went to New Jersey to visit my sick mother. Just before Thanksgiving he returned home for a few days. The following Monday he said he couldn't live without his girlfriend and left for good."
After reviewing all of the evidence on this issue, the court concludes that responsibility for the breakdown of the marriage rests exclusively with plaintiff.
Other Factors
The parties have contributed equally, each in his or her way, in the acquisition, preservation or increase in value of the marital estate.
Plaintiff has a much better opportunity than does defendant for the future acquisition of capital assets and income.
The liabilities of the parties are not so disparate as to merit comment.
Conclusion
Having considered all of the evidence as it pertains to Sec. 46b-81c C.G.S. and having given particular consideration to such predominating factors as the length of the marriage, the comparative incomes of the parties and their comparative opportunities for the future acquisition of capital assets and income, the health of the parties and fault, this court concludes that the marital estate of the parties, excluding plaintiff's unvested stock option, shall be divided as follows:
Plaintiff 43 percent
Defendant 57 percent
IV. The Distribution of the Marital Estate, Excepting Plaintiff's Unvested Stock Options, in accordance with the Findings in Article III
CT Page 638
Total Marital Estate $210,600
Plaintiff's Share (43%) 90,558
Defendant's Share (57%) 120,042
Plaintiff Shall Have:
 1/2 Equity in No. 715 Chestnut Hill Rd., Glastonbury, CT. -----
Checking account 1,000
Life Insurance
Thru employer F.U. $200,000 C.S.V. -----
Thru Met Life F.U. $408,000 C.S.V. -----
401K plan 25,358
CTG pension -----
Vested stock options (1/2) 24,888
Unvested stock options — see Art. VI
 Share of I.B.M. pension 39,312 ------ Total $ 90,558
 Defendant Shall Have:
1/2 equity in family house -----
Household furniture -----
1983 Avanti 2,000
Glastonbury Bank Trust Co. c/a 84
Merrill Lynch 6,429
Life Ins. Mass. Mut. FV $10,000 CSV 3,634 CT Page 639
Cemetery plots ----
Cash 5,000
Mercantile Bank 15,684
Share of plaintiff's 401K plan
Vested stock options (1/2) 24,887
Unvested stock options — See Art. VI
 Share of I.B.M. pension 62,324 ------ Total $120,042
V. Supplemental Order with Reference to the Distribution in Article IV
 A. Plaintiff shall execute all Qualified Domestic Relations Orders (QDRO) necessary to carry out any orders of the court.
 B. The parties shall be equally liable for any deficiency judgment resulting from the foreclosure of their home at No. 751 Chestnut Hill Road, Glastonbury, Conn.
 C. The parties shall execute all documents necessary to carry out the orders of this court.
VI. Plaintiff's Unvested Stock Options
At various times in the past the plaintiff has received a number of incentive stock options (I.S.O's) from his present his employer, Computer Task Group (hereinafter "CTG") in the amount of 2,275 shares. While he has not as yet exercised any of his options to purchase said stock, he has properly listed them as a marital asset on his financial affidavit and the parties are in substantial agreement as to their present value. Plaintiff has heretofore been authorized to purchase 25,125 additional shares of CTG on various future dates; these too are I.S.O.'s.
The manner in which this Court, in distributing the marital estate of the parties, should treat incentive stock options awarded to plaintiff by his employer after the separation of the CT Page 640 parties but prior to the dissolution of their marriage and which will not vest until on various dates subsequent to the dissolution is a troublesome question requiring detailed discussion.
First, it is noted that in CTG's 1991 Employee Stock OptionPlan (Defendant's Exhibit #15), the plan's purpose is stated to be "to provide key employees of the Company . . . additional incentives to continue and increase their efforts on the Company's behalf and to remain in the employ of the Company . . . In addition the plan is designed to increase the ability of the Company to attract and retain individuals of exceptional skill". Elsewhere the plan further provides that the options may be exercised only while the optionee remains employed by CTG.
In the instant case plaintiff could not have arrived at his advantageous position at CTG as a "key employee" without the prior concentration of his time, energies, and labor in the computer industry. From the evidence presented it is clear that his concerted effort was aided significantly by the defendant who helped to further his career and who contributed greatly to the marriage. Value is to be accorded to the defendant's "non-monetary contributions" which allowed the plaintiff to "devote substantial effort to paid employment" and assisted in the acquisition of property (O'Neill v. O'Neill, 13 Conn. App. 300, at 311 and 312). Even though the parties had separated, the plaintiff's prior expertise, experience, and labor were factors that allowed him to obtain the stock option benefits.
This Court has found no controlling Connecticut statutes or caselaw to guide it in determining two issues: (1) what amount, if any, of unvested stock options should be subject to eqitable distribution as marital property and (2) if subject to equitable distribution, what method should be used for division between the parties.
In its review of decisions from other jurisdictions this Court notes that some courts have held that stock options not vested at the time of dissolution should be excluded from the marital estate Hann v. Hann, 655 N.E.2d 566 (Ind.Ct.App. 1995);Hall v. Hall, 363 S.E.2d 189 (N.C.Ct.App. 1987). However, the majority of jurisdictions generally have concluded that unvested and/or unexercised stock options are marital property, albeit with some distinctions. Callahan v. Callahan, 361 A.2d 561
(N.J.Super.Ct. 1976 — vested and unvested options acquired during course CT Page 641 of the marriage were part of the marital estate); Pascale v.Pascale, No. A-91/92-94 (N.J.Sup.Ct. 1995 — stock options acquired after dissolution but acquired as a result of efforts expended during the marriage were subject to equitable distribution); Chenv. Chen, 416 N.W.2d 661 (Wis.Ct.App. 1987 — stock options granted after separation but prior to divorce were divided between the parties); Salstrom v. Salstrom, 404 N.W.2d 848 (Minn.Ct.App. 1984 — stock options that vested after date of dissolution had both "marital and nonmarital aspects" that made them subject to a "time rule" division); Smith v. Smith, 682 S.W.2d 834 (Mo.Ct.App. 1984 — unvested options to be distributed between the parties when they are exercised); In re Short, No. 61176-9 (Wash.Sup.Ct. 1995 — a "time rule" used in calculating parties' share or options that vested after separation); Goodwyne v. Goodwyne,639 So.2d 1210 (La.Ct.App. 1994 — unvested stock options were subject to division where they were conferred partly for past performance); Green v. Green, 494 A.2d 721 (Md.Ct.Spec.App. 1985 — unexercised and unvested stock options at time of trial were marital property); In re Hug, 201 Cal.Rptr. 676 (Cal.Ct.App. 1984 — "time rule" used to distribute stock options granted prior to the separation date but which were exercisable after that date); Richardson v. Richardson (Ark.Sup.Ct. 1983 — unexercised and non-transferable stock options were a type of security subject to marital property division); Mayer v. Mayer, Nos. 16663 and 16817 (NM Ct.App. 1996 — "time rule" used to partition unvested options between the parties at time of divorce).
Generally, a diversity of purposes typifies stock option plans. Other courts have recognized the difficulty in characterizing stock options. Hug, supra, at 679-681; Short,
supra, at 16. They may be granted for past, present, or future services. Thus a court must consider the facts of each case to determine the purpose behind the grant.
Here, the CTG Stock Option Plan outlines three goals to justify the granting of options: 1. retaining key employees; 2. attracting high quality personnel; and 3. providing work incentives. The plan is another benefit available to CTG personnel along with bonuses, a deferred compensation package, and a 401(k) plan. Part of the labor necessary to earn the option benefit occurred during the marriage of the parties and should be recognized in the distribution of the: marital estate. From the evidence plaintiff was employed for more than two years at CTG before the parties separated. This Court also notes the contingency aspect of the benefit: the plaintiff must continue CT Page 642 his efforts at CTG after the dissolution in order to obtain the options. As the plaintiff continues his association with CTG and now develops his career independent of the defendant's assistance, the value of her previous influence on his vocation diminishes considerably over time. In view of these recognitions and based on the Plan's purpose, the stock options have both marital and nonmarital aspects.
Because of the above considerations, this Court chooses for equitable reasons to follow the so-called "time rule" that was developed in the Hug case, supra, and its successors. In Hug, the California Court of Appeals sustained the trial court in its allocation of stock options as marital property that was incidental to the husband's employment by using the following formula: marital property was determined by a fraction that was multiplied by the number of shares that could be purchased on the exercise date. The numerator of the fraction was the difference in months between the beginning employment date and the parties' separation date; the denominator was the difference in months between the beginning employment date and when the option was first exercisable. The remaining portion of the shares were the separate property of the employee spouse.
This Court agrees with the Hug approach and heeds its advice regarding the need for flexibility in using formulas to determine portions of marital property subject to equitable distribution. While the formula is derived from a community property jurisdiction, in the interests of equity regarding the facts of this case, it is considered the proper approach. This would not be the first time a non-community property state looked to theHug formula and rationale for guidance in resolving stock option distributions. See Salstrom, supra.
This Court finds the following:
That the unvested stock options are part of the marital estate and are subject to equitable distribution.
That the Hug time rule formula should be used to determine the share of stock options to be awarded to the defendant. As it is undetermined from the record exactly when in 1991 the plaintiff commenced employment at CTG, the grant date of the first option (i.e. July, 1991) shall be used. The date of separation shall be August 1993 as elicited from plaintiff's testimony. CT Page 643
That after applying the Hug formula to plaintiff's unvested ISO's in accordance with the above findings, defendant's share of said ISO's is found to be as follows:
1. The formula expressed mathematically:
 Number of months from beginning date of employment to separation date ------------------------------------- X NUMBER OF Number of months from beginning date OPTIONS of employment to option exercise date
NOTE: All fractions in the following calculations are rounded off to the closest whole number.
 2. As to the 125 shares awarded April 28, 1993 which vest on April 28, 1997:
 7/91 — 8/93 = 25 X 125 = 25 X 2 = 50 ----------- — 7/91 — 4/97 69
 TOTAL TO DEFENDANT: 50 OPTIONS
 3. As to the 25,000 shares awarded in January/February 1996:
 Grant Date: January 1996 Number of Options: 15,000
 7/91 — 8/93 = 25 X 3,750 = 25 X 57 = 1,425 ----------- — 7/91 — 1/97 66
 7/91 — 8/93 = 25 X 3,750 = 25 X 48 = 1,200 ----------- — 7/91 — 1/98 78
 7/91 — 8/93 = 25 X 3,750 = 25 X 42 = 1,050 ----------- — 7/91 — 1/99 90
 7/91 — 8/93 = 25 X 3,750 = 25 X 37 = 925 ----------- --- 7/91 — 1/00 102 CT Page 644
 TOTAL TO DEFENDANT: 4,600 OPTIONS
 Grant Date: February 1996 Number of Options: 10,000
 7/91 — 8/93 = 25 X 2,500 = 25 X 37 = 925 ----------- — 7/91 — 2/97 67
 7/91 — 8/93 = 25 X 2,500 = 25 X 32 = 800 ----------- — 7/91 — 2/98 79
 7/91 — 8/93 = 25 X 2,500 = 25 X 27 = 675 ----------- — 7/91 — 2/99 91
 7/91 — 8/93 = 25 X 2,500 = 25 X 24 = 600 ----------- --- 7/91 — 1/00 103
 TOTAL TO DEFENDANT: 3,000 OPTIONS
GRAND TOTAL UNVESTED STOCK OPTIONS AWARDED TO DEFENDANT: 7,650OPTIONS
The plaintiff shall execute a Qualified Domestic Relations Order which will conform to the above orders.
The defendant shall to the procedures under the Plan for exercising options that have been distributed to her under this order.
The remainder of the options not distributed to the defendant are to be solely owned by the plaintiff.
Any stock options granted after the dissolution date shall be the exclusive possession of the plaintiff.
The plaintiff shall be under no obligation to the defendant for any unvested options allocated to her by this Court should he decide to leave CTG before the exercise dates.
The Court shall retain jurisdiction under Sec. 46b-4 C.G.S. CT Page 645
VII. Orders Concerning the Defendant
A. Alimony
In making the following orders concerning alimony, the court has considered all of the provisions of Sec. 46b-82 C.G.S., including the awards it has made pursuant to Sec. 46b-81 C.G.S. It is ordered that plaintiff shall pay alimony to defendant as follows:
 By the payment of $750 per week for a period of five years from date hereof
 By the payment of $650 per week for a period of four years thereafter, and
 By the payment of $550 per week thereafter until defendant attains the age of sixty-two at which time all payments of alimony shall terminate. These orders shall be non-modifiable as to term only but shall sooner terminate upon the remarriage of the defendant, her cohabitation with an unrelated male within the meaning of the statute, or the death of either party.
 During such time as plaintiff may be required to pay alimony to defendant, he shall also pay her upon receipt thereof fifty percent of any bonus he may receive.
It is the intent of this order to provide defendant with sufficient time and funds to hone and utilize her business skills and that such payments should terminate when defendant is eligible for social security and pension benefits awarded her supra.
During such time as plaintiff shall be required to pay alimony, the parties shall annually, commencing April 15, 1997, exchange federal income tax returns.
B. Life Insurance
Plaintiff is ordered to maintain his present life insurance policy with Met. Life in the present face value of $408,000 with defendant as irrevocable beneficiary. This coverage shall not be reduced until the balance of the outstanding alimony is less than CT Page 646 said coverage and thereafter shall always be equal to the outstanding alimony obligation.
Health Insurance
Plaintiff shall maintain defendant on his medical insurance policy for the maximum period of time prescribed by law at plaintiff's cost and expense.
VIII. Other Orders:
A. Liabilities
Each of the parties shall be solely responsible for all liabilities listed on his or her financial affidavit and shall hold the other party harmless in that regard.
B. Counsel Fees
After reviewing the financial orders made by the court in this matter, no award of counsel fees shall be made to either party.
BY THE COURT
John D. Brennan State Judge Referee
[EDITORS' NOTE: THE CASE THAT PREVIOUSLY APPEARED ON THIS PAGE HAS BEEN MOVED TO CONN. SUP. PUBLISHED OPINIONS.] CT Page 655