Filed 1/25/22  Burns v. Fitzgerald CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TERRANCE BURNS et al., | D078564 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2017-00044744-PR-TR-CTL) |
| PATRICK FITZGERALD, | |
| Objector and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Jeffrey B. Barton, Judge.  Affirmed.

Greenberg Traurig, Scott D. Bertzyk and Karin L. Bohmholdt for Objector and Appellant.

Henderson, Caverly, Pum & Trytten, Kristen E. Caverly and Lisa B. Roper for Plaintiffs and Respondents, Terrance Burns and Margaret Rasmussen.

### INTRODUCTION

This appeal arises from a dispute between the heirs of Terence Fitzgerald and the heirs of his wife, Barbara Fitzgerald, regarding the characterization of shares of stock in a company formed during the course of

their marriage. Barbara's heirs asserted the stock was community property and filed a petition to recover assets, including, among others, a one-half interest in the stock. Following a bifurcated trial on stipulated issues concerning the characterization of the stock, the trial court issued a statement of decision and order characterizing the stock as community property.

Terence's son, Patrick Fitzgerald (Patrick), appeals from the order and asserts, as he did in the trial court, that the stock was Terence's separate property based on a Premarital Agreement (PMA) executed by Terence and Barbara. In addition, Patrick asserts the trial court erred by denying a motion in limine and allowing Barbara's siblings and heirs, Margaret Rasmussen and Terrance Burns (Terry) (together, Respondents),[1] to change theories after the close of discovery to assert the stock was not covered by the PMA. Respondents contend the trial court's order is not appealable because it is not a final order and ask us to dismiss the appeal.

We conclude the order is appealable but find no error in the trial court's evidentiary ruling or its conclusion that the stock was community property. We therefore affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND[2]

Terence and Barbara were married in 1992. Terence had five children from a previous marriage—Paul Fitzgerald, James Fitzgerald, Elizabeth MacDonald, Kathleen Fitzgerald, and Patrick—who would later become his

[1]    As we later discuss, Barbara had a third sibling, David Burns, who is also an heir to her portion of the estate, but he subsequently withdrew from the petition and is not a party to the present appeal.

[2]    The following factual summary is taken primarily from the parties' written stipulation of facts entered into evidence at trial.

2

heirs (collectively, Terence's heirs). Barbara did not have any children, but did have three siblings—Margaret, David, and Terry—who would later become her heirs (collectively, Barbara's heirs).

Terence and Barbara executed a PMA prepared by Terence's attorney. The PMA states, "all property owned by either of them at the time of the marriage shall remain each party's separate property," and includes a list of each party's separate property. The list of Terence's separate property includes, among other items, a 401(k) retirement plan and "[m]iscellaneous employment benefits," but does not include any right to purchase stock or otherwise obtain ownership in any company.

The PMA also addresses income earned during the marriage. Under the heading "COMMUNITY PROPERTY," it states: "All earned income of either party during the marriage, including but not limited to all times when the parties are living together as husband and wife, from any source, shall be the separate property of that party. This shall include any employment benefits accruing during marriage, including but not limited to, 401K contributions, pensions, stock options, and the like." It provides that the parties "may establish a joint account to meet their common expenses" and "funds deposited into the joint account shall become community property." Further, "[a]ll assets acquired during marriage in the joint names of the parties, to the extent there are title documents, shall be community property, except that the parties may take title to property specifying unequal interests held by each party."

Before and at the time of marriage, Terence was the president of PAFCO Importing Company, Inc. (PAFCO), a food importing subsidiary of

Foodbrands America, Inc. (Foodbrands).[3]  However, by late 1995, Foodbrands had decided to liquidate PAFCO and was discussing both a severance package and a potential purchase of the PAFCO assets with Terence.

In March 1996, approximately four years into the marriage, Terence and business partner David Sjostrom (Sjostrom) formed F&S Acquisition Company (F&S) to acquire the assets of PAFCO.  Each contributed $25,000 in exchange for 25,000 shares of common stock and, on April 18, 1996, F&S issued stock certificates to Terence and Sjostrom reflecting their respective shares.  F&S also executed a promissory note in favor of Terence.  Concurrent with the transaction, and also on April 18, 1996, Terence and Barbara signed a "DECLARATION ACKNOWLEDGING AND IDENTIFYING COMMUNITY PROPERTY" (the Declaration), in which they acknowledged: "[A]ll interest in F & S . . . held in the name of Terence S. Fitzgerald is held as such for convenience only, and *is in fact our community property*" and "all amounts loaned to the company to date by Terence S. Fitzgerald constitute our community property."[4]  (Italics added.)

F&S subsequently acquired assets from PAFCO, including the rights to the PAFCO name, and changed its name to PAFCO Importing Company,

---

[3]     According to Patrick, Terence formed PAFCO, along with Patrick's grandfather, sometime around 1980, but later relinquished ownership.  It is undisputed that Terence did not own PAFCO at the time of Terence and Barbara's marriage.

[4]     The record suggests Terence entered into a separate severance agreement with Foodbrands around the same time, but the agreement was not entered into evidence at trial.

Inc.[5]  Terence was the president of F&S and was also on the board of directors, along with Sjostrom and another individual, Robert Cook.  In February 1997, Sjostrom resigned and Barbara was elected as a director in his place.  She also took on the role of Vice President.  For the next 17 years, until the time of Barbara's death, Terence and Barbara served as directors and as President and Vice President of F&S, respectively.

In December 1998, Terence and Barbara created "The Terence and Barbara Fitzgerald Trust" (the Trust).  The Trust documents were prepared by the same law firm as the F&S formation documents.  The Trust stated, "[a]ny community property transferred to the trust shall remain community property after its transfer."  It further provided that, upon the death of either Barbara or Terence, the Trust was to be divided "into three separate trusts, designated the 'Survivor's Trust,' the 'Exemption Trust,' and the 'Marital Trust.'"  The Survivor's Trust was to include "the Surviving Settlor's interest in the Settlors' community property" and the remainder was to be split between the Exemption Trust and the Marital Trust in accordance with certain federal estate tax thresholds.  Upon the death of the Surviving Settlor, the Survivor's Trust was to be distributed to the heirs of the Surviving Settlor and the Exemption and Marital Trusts were to be combined and distributed to the heirs of the other, previously deceased spouse.

Schedule A to the Trust identified all shares of F&S common stock as community property and identified the promissory note payable to Terence as Terence's separate property.  Concurrent with the funding of the Trust, F&S cancelled the certificate in the name of Terence and issued a new certificate

---

[5]    For ease of reference, and to distinguish the different corporate entities, we will continue to refer to the company formed by Terence and Sjostrom in 1996 as F&S.

to " 'Terence S. Fitzgerald and Barbara Burns Fitzgerald, as Trustees of the Terence and Barbara Fitzgerald Trust u/t/d 12.15.98.' " Terence also assigned the promissory note that F&S had issued to him to the Trust.[6]

In 2007, a different attorney, Peter Moye, prepared an "Amended and Restated Terence and Barbara Fitzgerald Trust" (the Restatement). Although somewhat more complex, the Restatement retains the same basic structure with distribution of assets through the three separate trusts upon the death of both spouses and does not materially change the treatment of the couple's community property. Moye testified at trial by deposition and said that he received a copy of Schedule A from the original Trust and that Terence and Barbara reported nothing had changed, so he used the same Schedule A for the Restatement.

Barbara died in September 2014. Terence served as the sole trustee of the Trust after Barbara's death, and Moye served as the trust administration counsel. Terence made cash gifts of $15,000 to each of Barbara's siblings in accordance with instructions in the Restatement but did not otherwise give notice to Barbara's heirs of any of the resulting trusts. According to Barbara's heirs, Terence did not fund the Exemption Trust as required by the trust documents.

Terence died in July 2017. Terence's daughter Elizabeth and Barbara's brother Terry became Co-Trustees of the Trust. In November, Terry filed a petition, as co-trustee, seeking an order characterizing the F&S stock as community property and instructing the co-trustees to fund the Exemption Trust with one half of the community property, among other relief. Barbara's

---

[6]     The couples' respective property rights in the promissory note are not at issue on appeal.

other heirs joined the litigation, and, in November 2018, they filed another petition pursuant to Probate Code sections 850, 17200, and 17206, seeking recovery of assets that should have been administered to the Exemption Trust, including the F&S stock, or, in the alternative, damages for the failure to properly fund the Exemption Trust, as well as an injunction freezing the assets until the underlying issues were resolved. Patrick filed a response and objections to the petition.[7]

F&S was liquidated and wound down beginning in the fall of 2018. The proceeds were held by the co-trustees and the parties subsequently stipulated to a bifurcated trial on the following two limited issues: 1) whether the F&S stock was community property or the separate property of Terence; and 2) if it was community property, the date upon which the Exemption Trust's 50 percent interest should be valued for purposes of funding.

Following the bifurcated trial, the trial court issued a statement of decision resolving the two issues. The court found that F&S was formed during the marriage and, concurrent with its formation, Terence and Barbara signed the Declaration acknowledging the stock was their community property. Regarding the PMA, the court found "the term 'employment benefits . . . and the like' [was] vague and ambiguous"; the PMA was "silent regarding the character of property acquired during marriage that [was] not earned income, not employment benefits and not 'in the joint names of the parties'"; and the list of Terence's separate property did not reflect "any stock options, rights to purchase assets from his employer or entity ownership." The court concluded that property acquired during marriage was

---

[7] The record indicates Elizabeth remains the co-trustee for Terence's heirs, but none of Terence's other heirs joined in the objections, or the present appeal.

7

presumptively community property, and that Patrick failed to rebut the presumption. The court therefore characterized the F&S stock as community property, and ordered that the value for purposes of funding the Exemption Trust should be calculated as of the date of Barbara's death.[8]

The court issued an order characterizing the stock as community property and Patrick timely appealed.

## DISCUSSION

### I.

### *Appealability*

Before turning to the merits, we first address Respondents' pending motion to dismiss the appeal. Respondents assert the order characterizing the F&S stock as community property is not an appealable "final order" because it does not resolve all issues in the underlying petition. We disagree.

An appeal may be taken from any order made appealable by the Probate Code. (Code Civ. Proc., § 904.1, subdivision (a)(10).) Appealable orders are set forth in Probate Code sections 1300 through 1304. Probate Code section 1300, subdivision (k), provides that an appeal may be taken from an order "[a]djudicating the merits of a claim made under Part 19 (commencing with Section 850) of Division 2." Probate Code section 850, subdivision (a)(3)(B), in turn, allows a trustee to file a petition requesting that the court make an order "[w]here the trustee has a claim to real or personal property, title to or possession of which is held by another." Probate Code section 1304, subdivision (a), further provides that an appeal may be taken from any "final order" made pursuant to Probate Code section 17200, with the exception of orders compelling an accounting or accepting the

---

[8]    The date of valuation is not at issue on appeal.

8

resignation of a trustee. Probate Code section 17200, in turn, provides that a trustee or beneficiary of a trust may petition the court for orders concerning the internal affairs of the trust, which includes, but is not limited to, orders "[a]scertaining beneficiaries and determining to whom property shall pass or be delivered upon final or partial termination of the trust, to the extent the determination is not made by the trust instrument." (Prob. Code, § 17200, subds. (a), (b)(4).)

Here, Barbara's heirs filed a petition pursuant to Probate Code sections 850, 17200, and 17206, and asserted they had a claim to property—the F&S stock—that was improperly withheld from the Exemption Trust. The court adjudicated the merits of that claim when it determined the F&S stock was community property such that Barbara's heirs did, in fact, have an interest in the stock. Moreover, the order effectively determined to whom the shares should pass upon termination of the Exemption Trust. Therefore, the order was appealable in accordance with both Probate Code section 1300, subdivision (k) and Probate Code section 1304, subdivision (a).

Respondents, however, assert the order was not a *final* order because it did not resolve all issues in the petition and did not determine the exact dollar amount to be recovered by the Exemption Trust or Barbara's heirs. Respondents rely primarily on civil cases discussing the one final judgment rule but, here, the order is made appealable not because it is a final judgment, but by application of statutes specifically making certain *orders* of the probate court appealable. (See Code Civ. Proc., § 904.1, subds. (a)(1), (10); *Estate of Stoddart* (2004) 115 Cal.App.4th 1118, 1124–1125 [explaining the difference between final orders under section 1304 and a final judgment].)

Further, in this context, we look to the order itself, and its legal effect, as opposed to the underlying petition, when determining whether the order is appealable. "[W]hen an order that might not otherwise be appealable 'expressly or implicitly decides other issues that could be the subject of an appealable probate order,' the order is appealable." (*Gridley v. Gridley* (2008) 166 Cal.App.4th 1562, 1586; see also *Estate of Miramontes-Najera* (2004) 118 Cal.App.4th 750, 755 ["it is well established that a probate order's appealability is determined not from its form, but from its legal effect"].) Although it does not resolve all claims at issue in the petition, the order does resolve finally the claims of Barbara's heirs regarding their entitlement to a community property interest in the F&S shares.

The order is appealable and we therefore deny Respondents' motion to dismiss the appeal.

## II.

### *The Trial Court Did Not Err by Characterizing the F&S Stock as Community Property*

Turning to the merits, Patrick's primary contention on appeal is that the F&S stock was Terence's separate property. He contends Terence started PAFCO and served as its president for years before the marriage, and that the acquisition of the PAFCO assets was a "benefit[ ]" of that employment, such that it was Terence's separate property pursuant to the PMA. In addition, he contends, even setting the PMA aside, a preponderance of evidence proves the F&S stock was Terence's separate property. We do not, however, reweigh the evidence under the applicable standard of review. On the record before us, we conclude that substantial evidence supports the trial court's factual findings that the F&S stock was acquired during the marriage,

10

it was therefore presumptively community property, and Patrick has failed to rebut that presumption.

A.    *Relevant Legal Principles and Standard of Review*

"Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property." (Fam. Code, § 760.) "Thus, there is a general presumption that property acquired during marriage by either spouse other than by gift or inheritance is community property unless traceable to a separate property source." (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 289–290 (*Haines*); see also *In re Brace* (2020) 9 Cal.5th 903, 924, 927 (*Brace*) [confirming the community property presumption set forth in Family Code section 760 applies to all property acquired during marriage on or after January 1, 1975].) "This is a rebuttable presumption affecting the burden of proof; hence it can be overcome by the party contesting community property status." (*Haines,* at p. 290; accord *In re Marriage of Weaver* (2005) 127 Cal.App.4th 858, 864.) However, "the burden is on the spouse asserting its separate character to overcome the presumption." (*See v. See* (1966) 64 Cal.2d 778, 783; *In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1185–1186 [spouse asserting property is actually separate property must overcome the community property presumption]; accord *In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1400 ["A spouse's claim that property acquired during a marriage is separate property must be proven by a preponderance of the evidence."].)

Of relevance here, California recognizes the ability of parties to enter into binding premarital agreements regarding the characterization of their property, including variances with the statutory community property presumption. (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 13 (*Bonds*); Fam.

11

Code, § 1612.)  Thus, absent fraud, duress, or undue influence, premarital agreements are generally enforceable.  (*Bonds,* at p. 13.)  Further, where there is a dispute as to the terms of a premarital agreement, "[t]he rules applicable to the interpretation of contracts have been applied generally to premarital agreements."  (*Ibid.*)

"The status of property as community or separate is normally determined at the time of its acquisition."  (*In re Marriage of Bouquet* (1976) 16 Cal.3d. 583, 591.)  "If it is community property when acquired, it remains so throughout the marriage unless the spouses agree to change its nature."  (*See v. See, supra,* 64 Cal.2d at p. 783.)  Family Code section 850 provides that married persons may transmute community property to the separate property of either spouse, or vice versa, but, pursuant to Family Code section 852, "[a] transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected."

We review the trial court's characterization of the F&S stock as community property under a mixed standard of review.  (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 184; *In re Marriage of Brandes* (2015) 239 Cal.App.4th 1461, 1472.)  We review the court's factual findings for substantial evidence.  (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734; *In re Marriage of Hill & Dittmer* (2011) 202 Cal.App.4th 1046, 1051–1052 (*Hill & Dittmer*) ["it is well established that the trial court weighs the evidence and determines issues of credibility and these determinations and assessments are binding and conclusive on the appellate court"].)  However, where "the basic 'inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values,' the determination in question amounts to the resolution of a mixed question of law and fact that is

predominantly one of law," which we review de novo.  (*Lehman,* at p. 184; *Brandes,* at p. 1472; *Rossin,* at p. 734.)

Patrick contends our review in this case should be purely de novo because there are no factual disputes.  Although the parties did stipulate to a significant portion of the underlying facts, a number of Patrick's assertions on appeal—including the intent of the parties and the assertion that Terence acquired the PAFCO assets as a benefit of his employment—are based, at least in part, on factual disputes.  To the extent the trial court made relevant factual findings, we will not reweigh the evidence and will, instead, accept the court's findings so long as they are supported by substantial evidence.  (See *Hill & Dittmer, supra,* 202 Cal.App.4th at pp. 1051–1052.)[9]

B.      *The F&S Stock Was Presumptively Community Property*

The trial court found F&S was formed—and the F&S stock at issue in this appeal was acquired—during the course of Terence and Barbara's marriage.  Substantial evidence supports that factual finding and the trial court's conclusion that the stock is presumptively community property.

There is no dispute that Terence and his business partner Sjostrom formed F&S to acquire the assets of PAFCO in March 1996, and that the original stock certificate was issued to Terence that April, while Terence was married to Barbara.  Patrick misapprehends the issue, however, and asserts that Terence started PAFCO long before he and Barbara were married.  He

---

9       Patrick also asserts there is no "presumption of correctness" because he filed objections to the proposed statement of decision, but the cases he relies on deal instead with preservation of issues on appeal.  (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134 [party must point out deficiencies in statement of decision to avoid *implied* findings and inferences]; *In re Marriage of Hardin* (1995) 38 Cal.App.4th 448, 453, fn. 4 [addressing preservation of issues on appeal].)

presents no evidence that Terence had any ownership interest—or any right to obtain an ownership interest—in the original PAFCO company when he and Barbara got married. Several years later, while still married, Terence and his business associate formed a *different* company, F&S, and that company acquired the *assets* of the original PAFCO company, including the name. As F&S did not exist until 1996, any interest Terence had in F&S was necessarily acquired during the marriage.

Thereafter, the parties continually acted in accordance with the statutory presumption of community property. Although the original stock certificate was issued in Terence's name, Terence and Barbara executed the Declaration *that same day*, in which they acknowledged, "all interest in F & S . . . is in fact our community property." Patrick asserts the Declaration is not reliable because the original was never found but he does not provide any evidence suggesting the copy was not authentic or any authority concluding an original was necessary. Moreover, the couple created the Trust a couple of years later and, with the assistance of counsel, again confirmed their intention that the stock was community property in schedule A.[10] They then had F&S issue a new certificate to " 'Terence S. Fitzgerald and Barbara Burns Fitzgerald, as Trustees of the Terence and Barbara Fitzgerald Trust u/t/d 12.15.98.' " Finally, they reaffirmed their intention once again in 2007 when they executed the Restatement, informed their counsel that there were no changes to their property interests, and, thus, used the same schedule A.

---

[10]    Patrick contends these documents are not proof of the parties' intentions because they are inconsistent with the PMA and insufficient to effectuate a transmutation. But, of course, those arguments assume, contrary to the trial court's finding, which we discuss *post*, that the PMA made the F&S stock Terence's separate property.

14

Because substantial evidence supports the trial court's finding that the F&S stock was acquired during the marriage, the trial court correctly concluded the stock was presumptively community property in accordance with Family Code section 760.

C.    *Patrick Failed to Rebut the Statutory Presumption*

The statutory presumption under Family Code section 760 is rebuttable by credible evidence showing, for example, "an agreement or clear understanding between parties regarding ownership status." (*Haines, supra,* 33 Cal.App.4th at pp. 289–290.) However, the burden falls to the party seeking to overcome the presumption and Patrick has not met that burden. (*See v. See, supra,* 64 Cal.2d at p. 783.)

1.    *The PMA Does Not Characterize the F&S Stock as Terence's Separate Property*

Patrick's primary contention on appeal is that the PMA defined the F&S stock as Terence's separate property, and the trial court erred because it "never bothered to interpret" the PMA. To the contrary, the trial court did interpret the PMA. It concluded the PMA was "silent regarding the character of property acquired during marriage that [was] not earned income, not employment benefits and not 'in the joint names of the parties' "; "the term 'employment benefits . . . and the like' [was] vague and ambiguous" but the parties' conduct evidenced that they did not consider the F&S stock to be Terence's separate property; and the list of Terence's separate property did not reflect "any stock options, rights to purchase assets from his employer or entity ownership." The court therefore looked to evidence of the parties' intent, and concluded Terence and Barbara intended the F&S stock to be community property. We find no error in the trial court's conclusions.

"The property rights of spouses prescribed by statute may be altered by a premarital agreement or other marital property agreement." (Fam. Code,

15

§ 1500; see also Fam. Code, §§ 1611, 1612.) Written premarital agreements are generally considered to be enforceable contracts, and are subject to the same rules of interpretation as any other contract. (*Bonds, supra,* 24 Cal.4th at p. 13.) "The primary object of contract interpretation is to ascertain and carry out the mutual intention of the parties at the time the contract was formed, determined from the writing alone, if possible. [Citations.] When the language of a contract is 'clear, explicit, and unequivocal, and there is no ambiguity, the court will enforce the express language.' " (*In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 688 (*Nassimi*).) We construe "the language of [each] provision . . . in context, in view of the intended function of the provision and of the contract as a whole." (*Ibid.*) To ensure our interpretation is consistent with the intent of the parties, we may also consider the circumstances under which the contract was made, as well as other extrinsic evidence that illuminates the parties' intent. (*Ibid.*; Civ. Code, § 1647; *In re Marriage of Benson* (2005) 36 Cal.4th 1096, 1108.) Where there is ambiguity in the terms that is not readily resolved by the other rules of interpretation, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." (Civ. Code, § 1654.)

Here, as the trial court correctly observed, the PMA does not specifically address the character of an ownership interest in a company acquired during the course of the marriage. Patrick contends the PMA provides that *all* assets brought into the marriage or acquired during the marriage are separate property unless placed in a joint bank account or subject to a title document expressly naming both parties, and therefore the F&S stock must be Terence's separate property. Patrick's interpretation of the PMA is not consistent with the plain language of the PMA.

First, the PMA states the parties "intend that all property owned by either of them *at the time of marriage* shall remain each party's separate property." (Italics added.) By its plain language, this refers to separate property in existence before the marriage. The PMA then sets forth a list of each party's separate property and, not surprisingly, does not list any potential ownership interest in F&S or the PAFCO assets as Terence's separate property. As Patrick himself concedes, he did not have a potential ownership interest in either at the time of the marriage. Thus, the F&S stock was not Terence's separate property *at the time of marriage* pursuant to the PMA.

Regarding assets acquired *during* the marriage, the PMA states, "[a]ll earned income of either party during the marriage . . . shall be the separate property of that party," and "[t]his shall include any employment benefits accru[ed] during marriage, including, but not limited to, 401K contributions, pensions, stock options, and the like." Thus, the PMA clearly identifies a single category of assets acquired during marriage—earned income, including employment benefits—as each spouse's separate property. The PMA further states that "[t]he parties *may* establish a joint account to meet their common expenses" and "[a]ny funds deposited into the joint account shall become community property." (Italics added.) In addition, it includes the following provision regarding assets jointly acquired during marriage subject to title documents (hereinafter, the joint title provision): "All assets acquired during marriage in the joint names of the parties, *to the extent there are title documents*, shall be community property, except that the parties may take title to property specifying unequal interests held by each party, in which case the specified unequal title interests shall be and remain separate

17

property interests of each party."[11] (Italics added.) Notably, it does *not* state that any property not held in a joint account or subject to a title document in the joint names of the parties is separate property.

Patrick asserts that, pursuant to the PMA, both the property brought into the marriage by each spouse and all income earned during the marriage by either spouse was each party's separate property. Based on those provisions, he contends *all* property acquired during the marriage must necessarily be separate property as well because such property could only be acquired with "earned income." He further contends, based on that interpretation, that the parties must have intended to replace the statutory community property presumption with paragraph five of the PMA, and, as a result, the *only* two ways for the parties to create community property was to deposit funds into a joint account or to take title in the joint names of the parties.[12]

The PMA does define the assets that the parties brought into the marriage and the earned income of each party during marriage as their separate property. However, the PMA stops there. As the trial court

_____

[11]    As discussed in more detail, *post*, Evidence Code section 662 provides a presumption of ownership based on legal title that may be implicated when real property is titled to husband and wife as joint tenants as it often is by default. (See *Brace, supra,* 9 Cal.5th at pp. 914–934 [detailing the history of Evidence Code section 662 and Family Code section 760].)

[12]    We note that Patrick includes a significant amount of argument in the statement of the case, and later incorporates entire sections by reference in his legal argument. Although we have considered the entirety of the briefing on appeal, "[w]e are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 (*Falcone*).)

correctly observed, the PMA is silent as to the characterization of property acquired during marriage that is *not* earned income. While property may be acquired with earned income, or separate property, the terms are not synonymous, as Patrick's assertions imply and, of course, property could also be acquired through the joint contributions of *both* spouses. Although Patrick suggests otherwise, there is ample evidence that Barbara did have her own separate property and that she also earned income during the marriage, as we discuss in more detail, *post*. Terence had the assistance of counsel and, if he had wished to define *all* property acquired during the marriage as each spouse's separate party, subject only to the joint account and joint title exceptions delineated in the PMA, he could have included straightforward language to that effect. He did not.

Patrick further contends the F&S stock is Terence's separate property under the PMA because it is "an 'employment benefit accru[ed] during the marriage.'" As set forth in the PMA, the term "employment benefits" falls within the definition of "earned income" and includes, but is "not limited to, 401K contributions, pensions, stock options, and the like." Under the principle of *ejusdem generis,* "where specific words follow general words in a contract, 'the general words are construed to embrace only things similar in nature to those enumerated by the specific words.'" (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1045.) Thus, we construe the general terms "including, but not limited to" and "and the like" in the context of the more specific enumerated terms. While 401(k) contributions, pensions, and stock options are all commonly understood benefits of employment, we agree

19

with the trial court that the F&S stock did not fall within that same category.[13]

Such an interpretation is consistent with the language of the contract as a whole and the evidence of the parties' mutual intent. (See *Nassimi, supra,* 3 Cal.App.5th at p. 688.) There is no basis in the PMA or the record from which to conclude that "employment benefits . . . and the like" includes an ownership interest in a new company formed during the marriage. To the contrary, while the other items are all common benefits of employment that provide additional earnings with minimal risk, acquisition of an ownership interest in a company *in lieu of employment* necessarily entails greater risk and may actually result in a decrease in earnings. Moreover, as the trial court concluded, the parties unambiguously stated that the stock was "in fact [their] community property" in executing the Declaration and specifically listed the stock as community property in schedule A. Such conduct leaves no room for interpretation; the couple did not believe the acquisition of an interest in F&S was an "employment benefit" under the PMA. Thus, we agree with the trial court's conclusion that the F&S stock was not "earned income" or an "employment benefit" as those terms are used in the PMA.

Patrick raises several arguments to the contrary, but we are not persuaded by any. First, Patrick asserts Terence "had been running PAFCO" for the previous 16 years and, thus, the assets he acquired were the direct result of his own labors, "many of them occurring prior to marriage." He

---

[13] The trial court found "the usage of the term 'employment benefits . . . and the like' vague and ambiguous," but ultimately concluded the conduct of the parties indicated the F&S stock was not an "employment benefit" under the PMA. We are not bound by the trial court's interpretation when conducting a de novo review of the contract language but, nevertheless, we reach the same ultimate conclusion as the trial court.

asserts Terence's "right to re-acquire" PAFCO was an " 'employment benefit accru[ed] during the marriage,' " akin to a stock option. It is not. A stock option is a type of bonus or profit-sharing in which a company gives an employee the right, or option, to buy shares of stock at a discounted or fixed price. (See *In re Marriage of Hug* (1984) 154 Cal.App.3d 780, 785.) As we have explained, Terence did not acquire stock in PAFCO—the company he worked for—and Patrick presents no evidence indicating Terence had any special *right* to acquire PAFCO, or its assets, arising from his employment.[14] To the contrary, it is undisputed that F&S—which was formed by Terence *and his business partner* during the marriage—*purchased* the assets from PAFCO in what appears to be an arm's length transaction.

To the extent Patrick asks us to infer that the purchase price reflected some sort of discount as a benefit of Terence's previous employment, the record does not support that contention. Although Terence negotiated his severance from Foodbrands concurrently with the purchase of the PAFCO assets, the letters between Terence and Foodbrands discussing his severance and the potential acquisition of assets show, as the trial court concluded, "that Terence rejected the proposal that he forego a separate severance

___

14    At oral argument, Patrick's counsel asserted that the purchase and sale of PAFCO was "expressly carved out" in Terence's severance agreement with Foodbrands as "a right" Terence would take with him upon termination of his employment, and thus acquisition of the F&S stocks was a benefit like a right to a stock option that arose from his employment. But as we previously noted, the severance agreement is not in the record. (See fn. 4 *ante*.) Rather, counsel directed this court to an unsigned copy of a single page of a severance agreement that is in the record and, contrary to his assertion, the language on which he appears to rely simply excludes any rights or claims arising from that *separate* transaction from the general release of claims associated with the severance agreement.

package as part of any asset purchase agreement." Patrick offers no credible evidence to refute this fact.

Second, Patrick asserts Barbara's heirs' interpretation of the PMA renders it largely irrelevant because it would have no application to separately held assets. As an initial matter, the contention is at least in part based on the fact that the parties *agreed* that certain retirement accounts—a category of employment benefits specifically addressed in the PMA—are the separate property of each spouse. It further assumes that the PMA does not address separately held assets *at all* if we conclude the joint title provision does not apply to property that is held by one party alone. To the contrary, the PMA also defines several items as each spouse's separate property, regardless of title documents. The PMA is not rendered irrelevant simply because one or more assets are not jointly titled and also do not fall within the enumerated categories of each spouse's separate property.[15]

In sum, we agree with the trial court that the F&S stock does not fall under the category of "employment benefits" as defined by the PMA and is not otherwise specifically addressed in the PMA. Accordingly, the PMA does not alter the characterization of the F&S stock and, likewise, does not rebut the statutory presumption that the F&S stock is community property.

---

[15] Patrick also contends that Respondents' interpretation of the PMA is "absurd" because it would allow one party to hold a 99.9999 percent interest in property as their separate property—if so defined by a joint title document—while defining property titled solely to one party as community property. He does not develop the argument, including explaining what Respondents' interpretation even is or how it leads to such an allegedly absurd result, nor does he provide any record citation. Because we are not bound to develop his arguments, we treat the contention as waived. (*Falcone*, *supra*, 164 Cal.App.4th at p. 830.)

2.  *Additional Evidence Does Not Rebut the Community Property Presumption*

Setting aside the PMA, Patrick asserts he presented sufficient additional evidence to rebut the presumption. In doing so, Patrick asks us to reweigh the evidence presented in the trial court, and to ignore the trial court's finding that there was no evidence that either spouse identified the F&S stock as Terence's private property during their lifetimes. Moreover, as he did in the trial court, Patrick overstates the significance of much of the evidence he relies on, which consists largely of financial documents prepared for purposes other than characterizing the couple's property interest. By contrast, as we have explained, in the few instances where the parties directly addressed the characterization of the F&S stock—in the Declaration and in Schedule A—they consistently characterized it as community property.

Patrick asserts the stock certificate, and various other financial documents listing Terence as the shareholder, prove Terence was the sole owner. As we have already discussed, the stock certificate itself is not dispositive as the parties executed the Declaration the same day explicitly stating that the stock was "held in the name of Terence . . . for convenience only," and it "is *in fact* [their] community property." (Italics added.) Since the Declaration states the stock was issued in Terence's name *for convenience only*, it is not surprising that he was subsequently listed as the owner or shareholder in various other documents. For example, Patrick points to a "DECLARATION REGARDING INVESTMENT" in which Terence represented he was acquiring the shares "for investment for Investor's own account, and *not with a view to or for sale*[.]" (Italics added.) As this declaration itself suggests, the purpose of the document was not to characterize the stock as Terence's personal property, but was instead to

23

ensure he was not planning to sell the stock. Similarly, Patrick points to a document in which the officers approved Terence's request to transfer "the shares he holds" to the Trust but, of course, the shares were listed, at that time, in his name. Moreover, the very purpose of the document was to cancel the certificate in Terence's name and re-issue a new certificate in the name of the Trust, and the same document states Terence wishes to transfer the shares to the Trust, of which he *and Barbara* "will be the settlors, trustees, and *lifetime beneficiaries*." (Italics added.)

Patrick also contends Terence stated F&S was his own corporation and that he bought his own company in a document submitted to the social security agency, but those statements were made in the context of explaining why he had received wages from what appeared to be a single company name under two separate employer identification numbers. Similarly, Terence stated that he transferred $25,000 in exchange for F&S stock in a tax filing for the purpose of asserting the transaction was a "tax-free transfer of assets." None of these statements were made for the purpose of characterizing the property as Terence's separate property.

Next, Patrick asserts all available evidence shows Terence paid for the F&S stock with his own money. While tracing is one way that a party may overcome the community property presumption, it would not be sufficient in this case because here, the parties also executed the Declaration concurrently with the purchase declaring that the stock was in fact their community property. Thus, even if Patrick could establish that the stock was purchased with Terence's separate property, it would not necessarily follow that the stock was Terence's separate property as a result.

In any event, Patrick does not present any evidence actually tracing the funds and, instead, argues the money must have come from Terence's

24

separate account.[16]  Patrick relies on various financial statements to assert the couple never created the joint account contemplated by the PMA, but those statements are joint statements and they provide no details regarding the listed accounts beyond the bank at which they were held.  Regardless, Barbara could have contributed funds to the purchase of F&S stock even in the absence of a joint bank account.  Patrick contends Barbara could not have done so because, according to the PMA, she entered the marriage with only $10,000 in total net assets, "meaning her available cash was even lower than that."  So, he asserts, "Barbara plainly lacked the financial wherewithal to fund a $25,000 stock purchase and $175,000 loan to PAFCO."  He ignores the fact that Barbara earned income throughout the marriage, including an annual salary of approximately $65,000 from 1993 to 1996, three years before F&S purchased the stock.  Patrick's own sister also testified at trial that Barbara had an account in her own name with a balance of approximately $130,000.  Patrick fails to identify that account or any other account into which Barbara's earnings were placed, and thus it appears the evidence he relies upon does not accurately represent the totality of the couple's finances.

Patrick further contends we can infer Terence paid for the PAFCO stock with his separate property because the severance amount he received was the same as the purchase price for the PAFCO assets.  Again, the record does not support his contention.  The only document Patrick references sets the purchase price for the inventory—the bulk of the assets purchased—as the "book value" on the closing date, less an agreed upon discount of "the smaller of (i) 10% of [the] book value or (ii) $25,000."  This document is not

16    Patrick contends tracing is not necessary because the joint title provision of the PMA eliminated the need for tracing.  As we have already explained, we disagree with Patrick's interpretation of that provision.

25

sufficient to establish the actual purchase price of the PAFCO assets. While we acknowledge courts have some flexibility to consider indirect evidence of tracing, here, the evidence is simply insufficient. (See *In re Marriage of Ciprari* (2019) 32 Cal.App.5th 83, 97 ["trial courts have the flexibility to consider any credible evidence and to evaluate alternative tracing methods to determine whether the proponent of the tracing carries his or her burden of proof"].)

Next, Patrick asserts Terence represented to his children that they would inherit the company upon his death. He provides no authority a self-serving oral statement is sufficient to alter the characterization of the property and, to the contrary, Family Code section 852 requires that a transmutation be in writing by an express declaration. To the extent he asserts Terence's statements are evidence of his intent at the time of signing the PMA, the alleged statements occurred years later, primarily during informal conversations in which Patrick admitted that Terence did not "get into specifics about his estate assets" or "how his estate was structured."

Similarly, Patrick asserts Terence's actions after Barbara's death is evidence that Terence believed the stock was his separate property. To the contrary, it is undisputed that Terence allocated *everything* except the $15,000 cash distribution specified in the Restatement to his own Survivor's Trust, including other items that were at least allegedly Barbara's separate property. Terence's own mishandling of the Trust after Barbara's death is not evidence of the party's mutual intentions at the time of marriage.

In sum, none of the evidence Patrick presents is sufficient to overcome the statutory presumption that the F&S stock was community property.[17]

---

[17]    Patrick asserts neither the Declaration nor any other document in the record was sufficient to effectuate a transmutation of the F&S stock from

3. *The Title Presumption Set Forth in Evidence Code Section 662 Does Not Overcome the Community Property Presumption*

Evidence Code section 662 provides: "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." Here, the trial court cited our high court's recent decision in *Brace* and concluded that "[t]he presumption that property acquired during marriage is community property trumps the form of title presumption in Evidence Code section 662." (See *Brace, supra,* 9 Cal.5th at p. 935.)

In his opening brief, Patrick asserted the trial court's statement regarding the relative weight of the two presumptions was "irrelevant" because he never argued that title was controlling. However, in supplemental briefing based on a recently published opinion from our sister court, *Estate of Wall* (2021) 68 Cal.App.5th 168 (*Wall*), he now contends the trial court's statement was error and that Evidence Code section 662 should prevail over the community property presumption in Family Code section 760. (See *Wall*, at p. 174 [Concluding Evidence Code section 662 prevails "when determining the character of real property in a probate matter."].)[18]

We conclude *Wall* is not instructive here as it involved title in the form of a deed to real property, not stock. (*Wall, supra*, 68 Cal.App.5th at p. 169.) In any event, *Wall* relies on *Brace*, in which our high court held "that the

Terence's separate property to community property. Because we have concluded the stock was always community property, and was never Terence's separate property in the first instance, no transmutation was necessary. Accordingly, we need not, and do not, address this assertion.

[18] The parties requested the opportunity to submit additional briefing addressing the impact of the decision in *Wall* on this case. We granted the request and have reviewed and considered the supplemental letter briefs.

27

community property presumption in Family Code section 760 applies not only to dissolution actions, . . . and that Evidence Code section 662 does not apply when it conflicts with the Family Code section 760 presumption." (*Brace, supra,* 9 Cal.5th at p. 935; *Wall,* at p. 175.)

In *Brace,* the Court addressed whether the form of title presumption set forth in Evidence Code section 662 applied to the characterization of property in a dispute between a married couple and a bankruptcy trustee over real property titled to the couple as " ' "husband and wife as joint tenants." ' " (*Brace, supra,* 9 Cal.5th at pp. 911–913.) To answer the question, the Court conducted a comprehensive review of the origins of both the community property and title presumptions under California law.

As the Court explained, historically, women did not have the same rights as their husbands to manage or control community property. (*Brace, supra,* 9 Cal.5th at p. 918.) The Legislature created the "married woman's presumption"—which stated, in part, the conveyance of property to a married woman by an instrument in writing created a presumption that title was vested in her as her separate property—" 'to facilitate the wife's management of property' by expanding her ability to acquire and manage separate property." (*Ibid.*) However, "[t]he married woman's presumption, when applied together with the community property presumption, sometimes led to claims by married women for more than a half interest in property *jointly deeded* to husband and wife." (*Ibid.*, italics added.) To address this concern, "the Legislature added language to Civil Code former section 164 to provide that joint conveyances to husband and wife created a presumption of community property *unless the form of title indicated otherwise*." (*Id.* at p. 921, italics added.) Later, in 1973, the "Legislature enacted landmark reforms that allocated equal management rights to the wife over community

property," and "eroded the original impetus for facilitating the wife's ownership of separate property." (*Id.* at p. 923.)  Thus, as the Court explained, "the rules characterizing property . . . based on form of title have faded," and, unlike the former statutes, "Family Code section 760 does not permit the community property presumption to be rebutted simply by the manner in which a married couple takes title." (*Id.* at p. 927.)

As a result, the Court concluded Evidence Code section 662 does not overcome the community property presumption in Family Code section 760, and expressly refused to limit its holding to the context of marital dissolutions.  (*Brace, supra,* 9 Cal.5th at p. 928.)  To address arguments raised by the appellants, the Court went on to explain, "our approach does not undermine the stability of title in the context of probate," and in that context, stated, "[c]ourts have consistently held that for property titled in joint tenancy, the form of title controls at death." (*Id.* at p. 931.)  Thus, as the Court explained, its holding "does not alter the well-established default rule that form of title controls at death, nor does it alter the procedures through which a surviving joint tenant may clear title to *real property held in joint tenancy*." (*Id.* at p. 934, italics added.)

In *Wall*, a husband died intestate and his wife petitioned the probate court for an order determining their home, which was titled in the husband's name alone, was in fact community property.  (*Wall, supra,* 68 Cal.App.5th at p. 169.)  The husband's children objected and, on appeal, asserted, among other arguments, that the trial court erred when it determined the Family Code section 760 community property presumption prevailed over the Evidence Code section 662 form of title presumption.  (*Id.* at pp. 169–170.)  The appellate court relied heavily on the *Brace* decision, but focused primarily on the high court's comments regarding stability of title and the

" 'default rule that form of title controls at death.' " (*Id.* at p. 175.) In doing so, the *Wall* court concluded that "the probate court erred in determining Family Code section 760 prevailed." (*Ibid.*) However, because the husband assured the wife her execution of a quitclaim deed putting the property in his name "meant nothing," the court ultimately set aside title under the undue influence presumption set forth in Family Code section 721. (*Wall,* at pp. 172–173.)

To state the obvious, the property at issue in this case is not real property. Thus, neither *Brace* nor *Wall*, which both address title in the form of a deed to real property, are directly on point. Changing course, Patrick now asserts the stock certificate is "the title document of relevance," akin to the deeds at issue in *Brace* and *Wall*, but he provides no authority indicating a stock certificate is a title document under either Evidence Code section 662 or the more general default rule discussed in *Brace* that form of title controls at death. (Cf. *In re Marriage of Barneson* (1999) 69 Cal.App.4th 583, 591–594 [refusing to apply Evidence Code section 662 presumption based on placing "title" to stock in wife's name].) To the contrary, as explained in *Brace*, those title presumptions arose from concerns regarding the ways in which spouses took joint title to real property. (See *Brace, supra,* 9 Cal.5th at pp. 918–927.)

Further, even if the stock certificate could be considered a title document, *Brace* is the controlling authority and, there, the Court held "that Evidence Code section 662 does not apply when it conflicts with the Family Code section 760 community property presumption." (*Brace, supra,* 9 Cal. 5th at p. 912.) We do not read the Court's statements in *Brace* regarding the default rule that, for property titled in joint tenancy, form of title controls at death as carving a wide exception to its primary holding that "Evidence Code section 662 *does not apply* to property acquired during

30

marriage *when it conflicts with Family Code section 760*," or as suggesting Evidence Code section 662 governs over Family Code section 760 in all probate actions. (See *Brace, supra*, 9 Cal.5th at p. 938, italics added.) Instead, as we have explained, the Court's discussion in *Brace* was centered squarely in the context of the joint title set forth in deeds to real property. (See *Brace, supra,* 9 Cal.5th at pp. 918–927.)

Finally, even were we to consider the stock certificate as a title document, Patrick ignores the form of title *at the time of death*. At the time of both Barbara and Terence's deaths, the stock certificate was issued to Terence and Barbara, as co-trustees of the Trust, and not to Terence in his own name. And the Trust and Restatement unambiguously defined the F&S stock as the couple's community property. (See *Allen v. Sutter County Bd. of Equalization* (1983) 139 Cal.App.3d 887, 890 ["it is a rudimentary principle of trust law that the creation of a trust divides title—placing legal title in the trustee, and *equitable* title in the beneficiaries"]; *Brace, supra,* 9 Cal.5th at pp. 931–934 [discussing common law rule that form of title controls *at death*].) Patrick contends the transfer of the stock to the Trust is "immaterial," but Patrick himself contends the original stock certificate is a title document. Thus, even if we were to accept his assertions, which we do not, that title controls at the time of death and the stock certificate is a valid title document, we would conclude the relevant title document establishes that the stock was held by Terence and Barbara as their community property.

## III.

### *The Trial Court Did Not Abuse Its Discretion by Denying Appellant's Motion in Limine*

Patrick also contends the trial court erred by denying his motion in limine and allowing Barbara's heirs to change theories after the close of fact discovery. We disagree.

Barbara's heirs originally asserted the PMA had been revoked, in part because the original could not be located. However, in January 2020, the attorney who prepared the PMA provided a copy of the original, along with a declaration certifying the document. In a deposition that same month, a rebuttal expert for Barbara's heirs opined, in response to questions asked by opposing counsel, that an asset taken solely in the name of one party would not fall under the joint title provision of the PMA.

Approximately 10 months later, on the eve of trial, Patrick asserted, in a motion in limine, that the rebuttal expert had presented a new theory after the close of fact discovery. Based on that contention, he asked the court to exclude "any evidence or argument to the effect that (i) although the express purpose of the [PMA] was to comprehensively 'defin[e] their respective property rights following their contemplated marriage' (Trial Ex. 1, p. 1), somehow it failed to address a circumstance where one spouse took title to an asset solely in his or her name, as happened with respect to the [F&S] stock (where Terence Fitzgerald took title alone); and (ii) as a consequence, statutory presumptions as to whether assets are community or separate property were left undisturbed." He also asked the court to exclude the expert as not timely disclosed and not the subject of proper rebuttal.

The trial court excluded the expert but concluded the theory was "a matter of contract interpretation and argument" and that "[t]he failure to

32

disclose in discovery can be cured by a request for continuance which, at least at this point, has not been made, if there is true prejudice." Patrick's counsel did not request a continuance or argue the issue further.

We review the trial court's ruling on the motion in limine for an abuse of discretion. (*Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 269.) We "will not disturb the trial court's decision unless the trial court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination." (*Ceja v. Dept. of Transportation* (2011) 201 Cal.App.4th 1475, 1481.) Here, the trial court reasonably determined the theory was primarily a legal theory and that any prejudice could have been resolved by a continuance. Having failed to seek a continuance, or additional discovery, despite the court's ruling, Patrick cannot now complain that he was prejudiced by the late disclosure.

Patrick asserts the trial court should have held Barbara's heirs to their sworn positions, but the primary case he relies upon concerns an affirmative admission that the party sought to reverse at trial. (See *Universal Underwriters Ins. Co. v. Sup. Ct.* (1967) 250 Cal.App.2d 722, 725–726, 729 ["With the receipt of Universal's answer to interrogatory 4, Pacific's attorneys were entitled to rely on Universal's admission that it did not contend that there was any legal consideration."].) By contrast here, the allegedly new theory did not directly contradict any of Barbara's heirs' previous responses. To the contrary, Barbara's heirs always contended the F&S stock was community property and that Terence and Barbara never intended for Terence to take title of the stock as his separate property.

Moreover, the discovery requests included in the motion did not ask Barbara's heirs to provide their interpretation of any provision of the PMA. When counsel asked the expert to do so at deposition, 10 months before trial,

the expert provided his response.  If Patrick believed he needed additional discovery as a result of the disclosure, he could have requested additional discovery.  (Code Civ. Proc., § 2024.050 [addressing motions to reopen discovery].)  Again, he did not make any attempt to do so.

Accordingly, we find no abuse of discretion in the trial court's denial of the motion in limine.

## DISPOSITION

The order is affirmed.  Respondents are entitled to their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:

AARON, Acting P. J.

DATO, J.